Barksdale, District Judge,
sitting by designation, delivered the opinion of the court:
This case is before the court pursuant to House Resolution 273, 84th Congress, 1st Session, adopted July 5, 1955, referring a bill, I-I.R. 2458, as authorized by 28 U.S.C., Section 1492 and Section 2509. At issue are the plaintiffs’ claims for damages for injuries sustained from the explosion, by three members of the armed services while on leave, of grenades on the premises of plaintiff, 62 Lenox Ave., Incorporated, known as “Royal Flush Bar and Grill”, in the City of New York, during the early morning hours of December 23,1952. Pursuant to 28 U.S.C., Section 2509, the court is charged with the duty of reporting “the facts in the case” and also “conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.” The resolution of reference and the referred bill are set out in full in the findings of fact which will appear later herein.
*33 Plaintiffs contend, first, that defendant is legally liable to them under the Federal Tort Claims Act, 28 TJ.S.C. 1346 (b). In the alternative, plaintiffs contend that, if the defendant is not legally liable to them, their claims against the defendant are equitable.
Briefly, the essential facts upon which liability depends, are that, about 1:15 a.m., on the morning of December 23, 1952, the individual plaintiffs were lawfully in the Royal Flush Bar and Grill, in New York City, the premises of plaintiff, 62 Lenox Ave., Incorporated. The plaintiffs did nothing to cause or provoke the explosion which followed and caused the injuries complained of. About that time, three servicemen came in, namely, Eugene Francis Mc-Dermott, nineteen years of age, a supply sergeant in the United States Marine Corps attached to the Headquarters and Service Company, 3d Battalion, 8th Marines, stationed at Camp LeJeune, N.C., and at that time on leave; Mark Sutter, nineteen years of age, a private in the United States Army, on leave from his station at Wolter’s Air Force Base, Texas; and Patrick J. Shanahan, nineteen years of age, a seaman in the United States Navy on leave from the Naval Technical Training Center, Jacksonville, Florida. All three were thoroughly intoxicated. McDermott had in his possession a white phosphorus incendiary grenade and a hand illuminating grenade, military ordnance manufactured specifically for use by the armed services. Although not ammunition for use against personnel such as a fragmentation grenade, they were intended to be used for illumination and as incendiaries, and were capable of causing severe burns and starting fires. Motivated by their feeling of intolerance of, and dislike for Puerto Ricans of Spanish origin, and their desire to cause trouble and frighten persons in a Puerto Rican neighborhood, the servicemen exploded the two grenades, causing severe injuries to the individual plaintiffs and damages to the premises of the corporate plaintiff.
McDermott, who had the grenades in his possession, was killed by a police officer while resisting arrest, so the question of how and where the grenades came into his possession depends largely upon circumstantial evidence. Live ammunition for Camp LeJeune was stored in magazines located *34 five to ten miles from the camp. There was no evidence of the use of any grenades at Camp LeJeune more than a possibility that some pyrotechnics might have been issued. During the fall of 1952, the command of which McDermott was a member engaged in maneuvers in Puerto Rico during which the troops used grenades, both fragmentation and pyrotechnic. The grenades were issued one at a time, and then exploded, and a careful check was kept to prevent the removal of any. Although there is no direct evidence of how McDermott came into possession of these grenades, the Commissioner found that:
It would seem a strong probability that McDermott, in the course of such maneuvers, in some manner obtained the two grenades in question and carried them back to Camp LeJeune with him, undetected, and took them with him when he went on leave. McDermott was the supply sergeant of the Headquarters and Service Company of the Battalion, and any such pyrotechnic grenades issued for the use of his company on maneuvers were probably distributed through him. The removal of such explosives from Camp LeJeune, N.C., was specifically prohibited by Marine Corps Regulations.
The Tort Claims Act, in effect, provides that the United States shall be liable in money damages “for injury or loss of property, or personal injury or death, caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.”.
We agree with plaintiffs’ contention that the North Carolina law of master and servant and the application by the courts of that State of the doctrine of respondeat superior, are applicable here to everything which took place in North Carolina. In the case of Williams v. United States (9th Cir.), 215 F. 2d 800, the Court of Appeals held that the question of whether a soldier was “acting within the scope <of his office or employment”, at the time his negligent conduct caused injury to the plaintiff, was a Federal question, *35 not governed by the California law of master and servant. The Supreme Court reversed, 350 U.S. 857, saying in a per curiam opinion:
This case is controlled by the California' doctrine of respondeat superior. The judgment is vacated and the case is remanded for consideration in the light of that governing principle.
Plaintiffs contend that McDermott was “acting within the scope of his office or employment” in taking the grenades away from Camp LeJeune, that the defendant was negligent in permitting him so to do, and that this negligence was the proximate cause of the plaintiffs’ injuries. Plaintiffs cite North Carolina authorities holding that persons having custody of dangerous explosives must exercise the highest degree of care, the degree of, care required being commensurate with the dangerous character of the article. This is, no doubt, the law of all the States, but the evidence in this case does not disclose any breach of this duty on the part of the defendant.
There is no direct evidence of how McDermott obtained these grenades, nor how he managed to bring them away from Camp LeJeune. Indeed, there is no direct evidence that he did obtain them at Camp LeJeune or during the Puerto Rican maneuvers, but it would seem that such an inference would be reasonable.' Viewing the evidence in the light most favorable to plaintiffs, the most that can be inferred is that these grenades were issued to McDermott as supply sergeant for use by the personnel of his battalion, but that, instead of using them for their proper purpose, or issuing them to others for such use, he secreted them and surreptitiously brought them with him to New York from Camp LeJeune when he went on leave. This was directly contrary to his duties as supply sergeant, and directly contrary to a specific . Marine regulation. Prior to December 23,1952, McDermott had a perfect military record, and there were no facts or circumstances to put his superior officers on notice he might be guilty of any dereliction of duty or violation of orders.
The North Carolina authorities relied on by plaintiffs do not justify a conclusion of negligence on the part of the de *36 fendant upon these facts. Plaintiffs rely primarily on Stewart v. Cary Lumber Co., 146 NC. 47, 59 S.E. 545. There,, the engineer of one of defendant’s trains, while operating his locomotive about his master’s business, “as he was passing near plaintiff, wantonly and unnecessarily blew the whistle of the engine to frighten plaintiff’s mulethe whistle being blown violently and for some time for the sole purpose of frightening the mule to amuse the engineer. In affirming a judgment for the plaintiff, the court said:
I fully agree that the rule obtains generally that the master is not answerable in damages for the wanton and malicious act of his servant, when not done in the legitimate prosecution of the master’s business, and that the evidence in this case presents “a positive affirmative tort,, pure and simple”, committed by the engineer without the master’s knowledge, approval or ratification.
The Court then went on to quote with approval the following:
“The rule obtains generally that a master is not answerable in damages for the wanton and malicious acts; of his servant, yet this immunity is not generally extended to railroad corporations whose servants have such extensive means of doing mischief. Accordingly, it has-been established that if their servants, while in charge of the company’s engines and machinery, and engaged about its business, negligently, wantonly, or wilfully,, pervert such agencies, the company must respond in damages; and this is the principle deducible from the authorities, upon such subject.” [Italics supplied.]
The other North Carolina case relied on by plaintiffs in this connection is Jones v. Seaboard Airline Railway Co., 150 N.C. 473, 64 S.E. 205. In that case, plaintiff attempted to climb upon a boxcar of a moving freight train for the purpose of stealing a ride. A flagman,on top of the car told plaintiff “to come up to him”, but plaintiff jumped off, started to run, and the flagman shot and injured him. The trial court submitted to the jury the question of whether or not the flagman was acting in the line of his duties, scope of his employment, and furtherance of the business of, the master. The jury answered the.question “No”. . In affirm *37 ing a judgment for the defendant, the court said that this question was properly submitted to the jury.
Referring to the Stewart case, supra, the concurring opinion said:
In the Stewart Case, in my opinion the company is held liable upon a well defined ground supported by most respectable authority, to the effect that a steam locomotive is such a dangerous instrumentality that the company is liable for the manner in which the engineer selected by the company uses it when running it in the company's business. [Italics supplied.]
The feature which distinguishes these two cases from the instant case is that in both cases the agent, at the time of the injury complained of, was actually engaged in the line of his duties and scope of his employment, using the master’s instrumentalities when he committed a wilful act, not in furtherance of his master’s business, to the detriment of the plaintiff. Not by the wildest stretch of the imagination could anyone say that McDermott, in taking grenades away from Camp LeJeune when he went on leave, was acting in line of duty, or within the scope of his employment, or in furtherance of his masters’ business.
Notwithstanding plaintiffs’ contention that the North Carolina doctrine of respondeat superior is unusually liberal from plaintiffs’ standpoint, it is our conclusion that the North Carolina doctrine is about the same as that obtaining in the majority of other States. In 35 Am. Jur. 995, the general rule is stated as follows:
According to the weight and trend of modem authority, the liability of an employer for the acts of his employee depends not upon whether the injurious act of the employee was wilful and intentional or unintentional, but upon whether the employee, when he did the wrong, was acting in the prosecution of the employer’s business, and within the scope of his authority, or had stepped aside from that business and done an individual wrong.
In support of this statement, a number of cases are cited, amongst them the North Carolina case of Ferguson v. Rex Spinning Co. 196 N.C. 614, 146 S.E. 597, 62 A.L.R. 1430. In that case, plaintiff, fourteen years of age, was working in *38 defendants’ cotton mill under one Barnes. He was performing bis duties in a place where he had a right to be. The defendant had furnished a compressed air hose of great force to Barnes for use in blowing grease and lint off frames in the cotton mill. “Barnes slipped up behind me (the plaintiff) and grabbed my arm and raised me clean off the floor with the hose pipe. He grabbed my left arm, put the hose pipe to me with his other arm, and raised me off the floor. I felt the air going in me and I grabbed his arm and I commenced sinking to the floor and that was all I knew until I woke up on the spare floor.” The Supreme Court reversed a judgment for the plaintiff. The court said:
The law, as stated in 18 R.C.L., pp. 795, 796, is as follows : . . . Whether the act was or was not such as to be within the employment’s scope is ordinarily one of fact for the jury’s determination. But if the departure from the employer’s business is of a marked and decided character, the decision of the question may be within the province of the court. “Where a servant steps aside from the master's business and does an act not connected with the business, which is hurtful to another, manifestly the master is not liable for such act, for the reason that, having left his employer’s business, the relation of master and servant did not exist as to the wrongful act.” [Italics ours.]
McDermott’s unauthorized and forbidden taking of the grenades from Camp LeJeune and exploding them in New York, seems to us to be as complete a stepping aside from the master’s business and the doing of an act not connected with its business, as can be imagined.
In the recent case of Voytas v. United States (June 1958), 256 F. 2d 786, relied on by the defendant, the factual situation was most analogous to the instant case. One Schat, a private in the United States Army, stationed at Fort Belvoir, Virginia, was a “set-up” man and “ammo guard” there. As a “set-up” man, he was authorized to handle equipment used in connection with explosives and as “ammo guard” it was his duty to protect explosives from pilferage. While inside the magazine building for the purpose of unloading explosives Schat stole several packages of an explosive known as “Composition C-3”, some blasting'caps and a length of fuse. He concealed these stolen articles for several days until he left *39 for Chicago on leave and took them with him. While there, he exploded some of the “Composition C-3” in the presence of a seventeen-year-old youth named Barnabee and others, and before leaving Chicago to return to his post, he gave Barnabee the remainder of the “Composition C-3” and the remaining caps and fuses. After Schat left Chicago, Barna-bee detonated the “Composition C-3” on a sidewalk in Chicago, resulting in the death of plaintiff’s decedent, an eight-year-old boy. Following Williams v. United States, supra, the court applied the law of Illinois to what happened there, and the law of Virginia to what happened at Fort Belvoir, Va. Recognizing the Virginia doctrine “that those who keep explosives must exercise a high degree of care to the end that injuries may not be inflicted”, the court held nevertheless “that there was no negligence on the part of the United States, since explosives were properly stored and guarded at Fort Belvoir and there was nothing in Schat’s record to indicate that, as ‘ammo guard’ he would be unfaithful to his trust or would be likely to steal explosives.”
The court said, p. 789:
One of the conditions for liability by the United States for negligent acts or omissions of its employees is that such employee must be “acting within the scope of his office or employment”. We agree with the learned trial judge that stealing government property is not an act in the line of duty or within the scope of employment of a member of the armed forces. Nor was he acting in line of duty or within the scope of his employment when he gave some of the stolen goods to a third party.
Title 28 U.S.C.A., Section 2671, provides in part: “Acting within the scope of his office or employment”, in the case of a member of the military or naval forces of the United States, means acting in line of duty. * * *
See also King v. United States, 178 F. (2) 320, and United States v. Lushbough, 200 F. 2d 717, both of which strongly support the Government’s position in this case.
It is therefore our conclusion that there is no legal liability on the defendant under the Tort Claims Act.
Nor do we find that plaintiffs have any equitable claim against the United States. The plight of the plaintiffs who were seriously injured through no fault of their own, arouses *40 the sympathy of all, but the responsibility for their injuries is upon the three individuals who perpetrated this outrage, and is not the responsibility of the United States. No negligence in the handling and storing of these explosives has been shown, and there was nothing in his record to indicate any likelihood that McDermott would steal these grenades. Plaintiffs’ injuries resulted solely from the deliberately wrongful and shameful act of the three drunken individuals. The facts that they were servicemen and that the grenades were Government property, are irrelevant. The conclusion is inescapable that McDermott stole these grenades for his private, individual purposes. The three servicemen were on leave, for the time being under no military control and engaged in no Government business whatever.
The Supreme Court has stated, that while on leave, a soldier “is at liberty to go where he will during the permitted absence, to employ his time as he pleases, and to surrender his leave if he chooses. If he reports himself at the expiration of his leave, it is all that can be asked of him.” United States v. Williamson, 90 U.S. 411, 415. Nor can any negligence on the part of the defendant be deduced from the fact that McDermott managed to get possession of these grenades and take them away from Camp LeJeune with him. In the very nature of things, an army must be equipped with lethal weapons and explosive materiel. To be effective at all, the army must train its personnel to use their weapons and explosives, and the only way to train soldiers to use their weapons and explosives is to have them use them. There was no negligence in issuing weapons and explosives through a supply sergeant, because that is a part of the duties of such an officer, and this supply sergeant, McDermott, had an unblemished record up until the time of this tragic occurrence.
It is therefore our conclusion that plaintiffs have no equitable claim upon the defendant, and that an award to them would be nothing more than a gratuity.
We have considered the exceptions of plaintiffs to the Commissioner’s findings of fact, but perceive no occasion to differ from the Commissioner’s findings which will follow, to be *41 certified to the Congress pursuant to House Resolution 273, supra.
It is so ordered.
Laramore, Judge; MaddeN, Judge; Whitaker, Judge; and JONES, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Currell Vance, and the briefs and arguments of counsel, makes findings of fact as follows:
1. H. Res. 273, 84th Congress, 1st session, adopted July 5, 1955, provides as follows:
Resolved, That the bill (H.R. 2458) entitled “A bill for the relief of Edward Gordon, Morton Gordon, John J. Dahill, Esteban Melendez, Jean Garcia, Marie Flynn, Carmen Rodriquez, and 62 Lenox Ave., Incorporated”, together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House of Representatives, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
2. The bill (H.R. 2458) referred to in H. Res. 273, reads as follows:
A BILL
For the relief of Edward Gordon, Morton Gordon, John J. Dahill, Esteban Melendez, Jean Garcia, Marie Flynn, Carmen Rodriquez, and 62 Lenox Ave., Incorporated.
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay, out ox any money in the Treasury not otherwise appropriated, the sum of $50,000 to Edward Gordon; the sum of $10,000 to Morton Gordon; the sum of $7,500 to John J. Dahill; the sum of $10,000 to Esteban Melendez; the sum of *42 $10,000 to Jean Garcia; the sum of $10,000 to Marie Flynn; the sum of $1,500 to Carmen Rodriquez; all of New York City, New York State, and to pay 62 Lenox Ave., Incorporated, the sum of $1,200.
Payment of such sums shall be in full settlement of all claims against the United States for personal injuries and property damage sustained by these claimants from the explosion of phosphorous and flare bombs as a result of a conspiracy, and while acting in concert, on the part of a marine, James Eugene McDermott, a sailor, Patrick J. Shanahan, and a soldier, Mark Sutter, then in the service of the United States Marines, the United States Navy, and the United States Army, respectively, in premises 874 Columbus Avenue, city, county, and State of New York, said phosphorous and flare bombs belonging to the military and/or naval forces of the United States Government causing personal injuries to all of the persons enumerated in this bill and to the financial damage of 62 Lenox Ave., Incorporated, above set forth: Provided, That no part of the amount provided for in this bill shall be subject to any claim for reimbursement to any insurance company or compensation insurance fund which may have paid any amount to the claimants herein by reason of the personal injuries and property damage incurred: And Provided Further, That no part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with the claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
3. Plaintiffs Edward Gordon, Morton Gordon, John J. Dahill, Esteban Melendez, Jean Garcia, Marie Flynn and Carmen Rodriquez are all citizens of the United States and at all times hereinafter mentioned were residents of the city and state of New York.
4. Plaintiff, 62 Lenox Ave., Incorporated, is a corporation organized and existing under the laws of the State of New York, and at all times hereinafter mentioned operated the Royal Flush Bar and Grill at 874 Columbus Avenue, New York City.
5. At approximately 1:15 a.m. on the morning of December 28, 1952, Eugene Francis McDermott (referred to in *43 H. R. 2458 as James Eugene McDermott), Mark Sutter and Patrick J. Shanaban entered the Royal Flush Bar and Grill. Acting together they exploded a prosphorous incendiary grenade and a hand illuminating grenade in the premises.
6. At the time of the explosion the individual plaintiffs were lawfully at the premises. The plaintiffs had done nothing to cause or provoke the explosion.
7. As a result of the explosion of the grenades the individual plaintiffs were burned and injured, and the premises of plaintiff 62 Lenox Ave., Incorporated, caught fire and were damaged, as set out below:
(a) Plaintiff Edward Gordon was 57 years of age at the time of the explosion. He was the manager of the Royal Plush Bar and Grill. The phosphorous incendiary grenade exploded at his feet, causing him to suffer numerous burns of varying degree on the right ear, forehead and nose, all over his face, on left hand and thumb, left leg and knee, and elsewhere, leaving numerous scars, many of which are permanent.
Plaintiff Edward Gordon was hospitalized for 2 weeks or more after the explosion and then was confined to his home until April of 1953. At that time he was afflicted with an attack of hepatitis due to the phosphorous which had entered the blood stream and was hospitalized again for approximately a month, beginning the first week of April.
As a result of the explosion and the resulting burns plaintiff Edward Gordon suffered some permanent loss of hearing in the right ear; substantial permanent loss of the mucous membrane of his nose; sustained a 15 degree loss of flexion of left thumb; and 10 degree loss of flexion of left knee; and lost five teeth.
The most incapacitating consequence of this plaintiff’s injuries was that he suffered severe post-traumatic neurosis of a hysterical conversion type, and a depressive reaction, characterized by dizzy spells, accompanied by occasional brief periods of loss of consciousness, by frequent headaches, by periods of depression, irritability, and stomach spasms, and by inability to sleep properly at night, or to keep awake during the day. At the time of his medical examination on behalf of the Department of Justice, which took place 3% years after the explosion, the medical opinion was that *44 plaintiff Edward Gordon continued to be psychiatrically unfit to carry on his usual occupation as a result of his neurotic reaction to the explosion and to his injuries.
(b) Plaintiff Morton Gordon, at the time of the explosion, suffered numerous burns of varying degree, on left ear, nose, eyelids, chin, his entire face, and right hand, leaving many permanent scars. He also lost most of his hair in this explosion. He has been under the care of three different doctors for his burns, for the nervous condition, and for the nasal condition.
At the time of the medical examination on behalf of the Department of Justice, 314 years after the explosion, Morton Gordon continued to experience a stinging sensation at the burn scars of the right hand and left ear. The scars on the palm of the right hand were adherent and only slightly moveable. His nose is moderately enlarged, and he suffers frequent nosebleeds as a result of the nose injuries. He also suffers a post-traumatic neurosis, or nervous condition, as a result of his experiences at the time of the explosion and his injuries, which still persisted in mild degree at the time of this examination, characterized by acute intolerance to noise, being easily frightened by loud or sudden noises, by restlessness, and by tension, with a tendency to poor memory because of tension and preoccupation.
(c) Plaintiff John Dahill is a police officer in the New York City Police Department. Just prior to the explosion he had entered the Eoyal Flush Bar and Grill to investigate Sutter’s suspicious conduct in running from the premises, and was caught in the explosion. He received a departmental citation from the Police Department in connection with his conduct at the time of the explosion.
This plaintiff suffered numerous burns of varying degree on the upper portions of both arms, on the calves and lower portions of both legs, and a large third-degree burn on his right ankle and foot, leaving many permanent scars. There is very little normal skin remaining between the scars on his right calf. One scar, measuring 10 centimeters by 2 centimeters, commences on the medial aspect of the right ankle and extends over and around the achilles tendon of the right foot. This scar becomes irritated, burns and *45 itches, and has caused the plaintiff to take sick leave 5 or 6 times yearly since he returned to active duty.
Following the explosion, plaintiff Dahill was in the hospital for 2 days, was on sick leave for 6 months, and then was put on a light duty basis for an additional 6 months.
(d) Plaintiff Esteban Melendez sustained numerous burns of varying degree on forehead, face, chin, neck, wrist and hand, leaving many permanent scars. The largest permanent scars are: a scar 1 inch by y2 inch next to left eyebrow, and a scar 2 inches by 1 inch on front of the neck.
(e) Plaintiff Jean Garcia, an unmarried woman, received numerous burns of varying degree on left lower leg and ankle, the shin and calf of right leg and right ankle and foot, leaving numerous permanent scars. She received a skin graft on the front lower portion of her left leg, leaving a permanent brownish scar 3x4 centimeters in size, and causing a cluster of white scars on her left thigh, the donor site of the skin graft.
(f) Plaintiff Marie Flynn, a married woman, received numerous burns of varying degree on forehead, nose, face, neck, shoulders, upper arms, right forearm, abdomen, lower legs and feet, leaving numerous permanent scars. The larger permanent scars are: a depressed scar 4 centimeters by 4 millimeters on the nose; a diamond-shaped scar on the right shoulder 8 by 2 centimeters, and a scar on the left foot 4 by 5 centimeters in size. The numerous scars on the face and neck are pigmented and quite noticeable because of color contrast.
(g) Plaintiff Carmen Rodriquez at the time of the explosion received painful erythematous bums with rare blistering both ankles and lower legs, which were diagnosed as first degree burns. She was given first aid treatment at St. Luke’s Hospital, and an appointment for a return later that day, but did not return.
(h) Plaintiff, 62 Lenox Ave., Incorporated, suffered loss of personal property and damage to its premises as a result of the explosion and fire. The replacement value of the damaged items was approximately $1,200.
8. Eugene Francis McDermott was 19 years of age at the time of the explosion. He was a supply sergeant in the United States Marine Corps, attached to the Headquarters *46 and Service Company, Third Battalion, Eighth Marines and was stationed at Camp LeJeune, North Carolina. At the time of the explosion he was on leave from Camp LeJeune, North Carolina.
9. Immediately after activating the fuse of the incendiary grenade, McDermott was pursued by a police officer. Mc-Dermott was shot and killed while resisting arrest and attempting to attack the officer with a knife.
10. Mark Sutter was 19 years of age at the time of the explosion. He was a private in the United States Army. At the time of the explosion he was on leave from Wolters Air Force Base, Texas, where he was stationed.
11. Sutter was arrested shortly after the explosion and pleaded guilty of arson in the third degree in the Court of General Sessions for the City of New York. He received a suspended sentence from the Court of General Sessions and was turned over to Army authorities. No disciplinary action was taken against Sutter by the Army and he received an honorable discharge in October 1955.
12. Patrick J. Shanahan was 19 years of age at the time of the explosion. He was a seaman in the United States Navy. At the time of the explosion he was on leave from the Naval Technical Training Center, Jacksonville, Florida, where he was stationed.
13. Shanahan was arrested shortly after the explosion and pleaded guilty to arson in the third degree in the Court of General Sessions for the City of New York. He received a suspended sentence from the Court of General Sessions and was turned over to Naval authorities. Shanahan was court-martialed for overstaying the period of his leave during the time he was confined by New York police. He received a suspended three-month sentence from the Navy Court Martial and forfeited 3 months’ pay. He was discharged as “undesirable” in September 1953.
14. McDermott, Sutter and Shanahan had been drinking heavily throughout the evening prior to the explosion. At the time they exploded the grenades they were thoroughly intoxicated.
15. The action of McDermott, Sutter and Shanahan in exploding the grenades was motivated by their feeling of *47 intolerance of and dislike for Puerto Eicans of Spanish origin, and by their desire to cause trouble and frighten persons in a Puerto Eican neighborhood.
16. The two grenades involved in the explosion were (1) a white phosphorous incendiary grenade, and (2) a hand illuminating grenade. These grenades are of the type of official military ordnance, and had been manufactured specifically for use by the Armed Services.
17. These grenades are sometimes referred to as pyrotechnics and are used for illumination and as incendiaries. While they are capable of causing severe burns and starting fires, particularly in a small, crowded, enclosed space, they are not the ammunition adapted for use against personnel. For the latter use a fragmentation grenade is used.
18. The two grenades involved in the explosion at the Eoyal Flush Bar and Grill had been in the possession of Eugene Francis McDermott. Since he is dead, the question of how and where these grenades came into his possession depends largely upon circumstantial evidence.
19. McDermott’s commanding officer at the time the explosions occurred, and for some months prior thereto at Camp LeJeune was Col. Erik William Eitzau, and he was a witness in the case. Live ammunition at Camp LeJeune was stored in magazines in charge of the Ordnance Branch located 5 to 10 miles from Camp LeJeune. Colonel Eitzau could not recall the use of grenades, either fragmentation or pyrotechnic, at Camp LeJeune, nor the issuance of same to his battalion, though he admitted the possibility that some pyrotechnics might have been so issued.
However, he stated that his battalion went on maneuvers during the fall of 1952 to the Island of Vieques, Puerto Eico, and during such maneuvers the troops engaged in fragmentation grenade practice, and in maneuvers where the pyrotechnic grenades were employed. The fragmentation grenade practice was closely supervised, and the men were taken in small relays to pits from which the grenades were thrown, and in which the men would crouch to avoid injury from flying fragments. The grenades were issued one at a time and then exploded, and a careful check was kept to prevent the removal of any. In the troop maneuvers frag *48 mentation grenades were not used, but incendiaries and phosphorous illuminating grenades were used to simulate battle conditions.
It would seem a strong probability that McDermott, in the course of such maneuvers, in some manner obtained the two grenades in question and carried them back to Camp Le-Jeune with him, undetected, and took them with him when he went on leave. McDermott was the supply sergeant of the Headquarters and Service Company of the battalion, and any such pyrotechnic grenades issued for the use of his company on maneuvers were probably distributed through him.
20. The removal of such explosives from Camp LeJeune, North Carolina, was specifically prohibited by Marine Corps Regulations.
21. As shown above, H.R. 2458 referred to the court, recited allowances to the respective plaintiffs as follows: “the sum of $50,000 to Edward Gordon; the sum of $10,000 to Morton Gordon; the sum of $7,500 to John J. Dahill; the sum of $10,000 to Esteban Melendez; the sum of $10,000 to Jean Garcia; the sum of $10,000 to Marie Flynn; the sum of $1,500 to Carmen Rodriquez.”
As far as the testimony in this case is concerned, any damages sustained by plaintiffs are unliquidated damages and susceptible of determination only by a jury verdict. There is no proof from which it is possible to put a dollar value on such damages. From the nature of plaintiff’s injuries, as above recited, it would seem that a substantial proportion of the sums listed for each plaintiff would have to be regarded as punitive or exemplary damages rather than compensatory.
If plaintiffs are deemed entitled legally or morally to a recovery limited to compensatory damages, it would appear that not over 50 percent of the amount recited in each case should be allowed.
22. The sum of $1,200 proposed by H.R. 2458 to be paid to plaintiff 62 Lenox Ave., Incorporated, is fair and reasonable compensation for its property damage, and is found to be the damages sustained by this plaintiff.