CoweN, Chief Judge,
delivered the opinion of the court :
This action is before the court pursuant to House Resolution 112, 87th Congress, 1st Session, which referred to us H.R. 2676 for our findings and recommendations as to whether plaintiff has a-legal or an equitable claim. Our jurisdiction is invoked pursuant to 28 U.S.C. §§ 1492, 2509.[1]
In December 1946 the plaintiff signed a contract of employment with the Army Exchange Service (AES) providing that he would serve as a junior auditor with the AES in Germany for a period of one year. Shortly thereafter, plaintiff was sent to Germany and assigned to the AES operations near Bremen. Plaintiff worked in the accounting office which served all post exchanges in the Bremen area. He was assigned civilian housing in the town of Lesum, near Camp Grohn where he worked.[2]
Early in 1947 there arose a requirement for an audit of the accounts of the Officers’ and Enlisted Men’s Clubs in the Bremen area.[3]
The club authorities asked the local exchange management if one of the AES auditors would be interested in doing the club auditing work as an extra job and for pay. Prior to 1947, the club council had contracted with German bookkeepers to perform the audits. The bookkeepers were paid *229 from club funds. Tbe local exchange officer requested the chief auditor to ascertain if any of his assistants was interested in the job. When he was advised that plaintiff was interested, the exchange officer told plaintiff that the work was voluntary and was to be performed for the Officers’ and Enlisted Men’s Clubs during plaintiff’s off-duty time. The exchange officer also told plaintiff that compensation for the audit was a matter to be agreed upon between him and the local military commander who exercised ultimate control over the clubs.
Plaintiff was eventually referred to the club officer who was directly responsible for club operations. The club officer outlined the nature of the job, indicated that the plaintiff could work at the club’s office or at his home, and stated that the amount of plaintiff’s compensation would be determined when it became known how much work was involved in the job. Plaintiff agreed, began the audit in early January 1947, and was still working on the material in early July of 1947. He spent an average of four nights per week, for about 2 to 8 hours each night, on the accounts.
On several occasions during this period, plaintiff felt that it was necessary to secure the assistance of a typist. He was helped by Mrs. Meyer, a German national and widow of a German Army officer; she was employed by the AES in Bremen. Mrs. Meyer was. paid by plaintiff in foodstuffs and other goods. She was not assigned to the job by the AES, nor was her assistance to plaintiff in any way connected with her AES employment. The club officer did not authorize or suggest that plaintiff hire an assistant. Plaintiff was solely responsible for obtaining the services of Mrs. Meyer.
On the evening of July 8, 1947, when Mrs. Meyer was assisting plaintiff, they finished their work about 10:30 p. m. Plaintiff was worried about allowing an unescorted woman to walk home at night because of the perils of marauding soldiers and others. On their previous working nights, plaintiff had sometimes walked with her to her home and sometimes not; he testified that he did not believe that he was under any duty to so escort her. About midnight on July 8, 3947, after he had left Mrs. Meyer near her residence and *230 while he was on his way home, plaintiff was brutally assaulted and robbed by two Polish displaced persons. Plaintiff suffered permanent and major injuries as the result of this beating. The assailants were caught and eventually sentenced to major prison terms for their offense.
There was in effect at the time of plaintiff’s employment with the Army Exchange Service an insurance policy which the Army Exchange Service had voluntarily entered into with a private insurance company, the Indemnity Insurance Company of North America, pursuant to Public Law No. 208 of the 77th Congress, 55 Stat. 622, which entitled an employee of the Exchange injured in the course of his employment to be paid the amount which he would have received had he been covered by the Longshoremen’s and Harbor Workers’ Compensation Act, 44 Stat. 1424 (1927), 33 U.S.C. §§901-950.
On October 18, 1947, after he had returned to the United States, plaintiff was interrogated by a representative of the insurance company. Plaintiff told the investigator that he was assaulted while taking a walk alone along the Lesum Eiver. In the trial of tins action, plaintiff acknowledged that this was a false statement, made to avoid trouble with his wife, whom he believed to have overheard Ms statement to the insurer’s representative.
The insurance company denied liability to plaintiff on the ground that the injury was incurred outside the course of plaintiff’s employment. There is no evidence that plaintiff has taken any action to collect from the insurance company.
Plaintiff has attempted to obtain relief for the loss of his property and for his personal injuries (see findings 21-26 infra.). He has been successful to the extent that he has received compensation for the value of property taken into the custody of the Army Criminal Investigation Division after the attack and subsequently lost in a burglary of the CID office, Priv. L. No. 25,65 Stat. A12 (1951).
At the outset it should be stated that plaintiff concedes that he does not have a legal cause of action. We agree. First, the claim is barred by the statute of limitations, 28 U.S.C. § 2501. Second, plaintiff is without the coverage of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2670-2680. The injuries were received by acts committed in a *231 foreign, country and were not caused by agents of the United States. Third, even if plaintiff be deemed an employee of the AES or the Officers’ and Enlisted Men’s Clubs and it were conceded that he was acting within the scope of his employment, he cannot receive compensation under the Federal Employees Compensation Act, 5 U.S.C. §§ 751-803(a). Both employing agencies are nonappropriated fund instrumen-talities and are not within the coverage of that Act. Fourth, plaintiff’s contract with the AES contains a specific waiver which includes the type of claim here asserted.
As the primary basis for the equitable claim asserted by plaintiff, he contends that he was ordered to perform the club audit by his-superiors in AES and at no additional compensation; that he was assaulted while escorting his assistant home; that his injuries were suffered while he was acting within the scope of his employment with AES and, therefore, that if his employer had been a private party, he would be entitled to workmen’s compensation.
Plaintiff does not in this action claim compensation for the reasonable value of his services in making the audit. Apparently he feels that his theory of the case is antithetical to such a demand.
An “equitable claim”, as that term is used in 28 U.S.C. § 2509, has been defined in various decisions in this court as one based upon the broad moral principles of right and justice and which arises under circumstances in which the conscience and honor of the sovereign dictate that plaintiff should be compensated. Thus, in cases where no legal claim existed, we have held that plaintiff has an equitable claim for losses sustained directly through the fault of the government, Clark v. United States, 167 Ct. Cl. 197 (1964), and also for injuries caused by negligent acts of government agents in situations where the United States would be liable if it were suable as a private individual, Estates of Armiger, et al. v. United States, 168 Ct. Cl. 379, 339 F. 2d 625 (1964).
There is no substantial dispute as to the material facts, except the issue as to whether plaintiff undertook the audit of the books of the Officers’ and Enlisted Men’s Clubs upon the orders of his superiors in AES. There was a direct conflict in the testimony on the point and our trial commissioner *232 has found the facts contrary to plaintiff’s contention. Since plaintiff has not sustained the burden of showing that the commissioner’s finding is clearly erroneous, we have adopted the commissioner’s finding.
In determining whether plaintiff has an equitable claim, our first inquiry is whether the United States caused or in any way contributed to the injuries received by plaintiff. This question must be answered in the negative, because the undisputed facts show that plaintiff’s injuries resulted from a beating administered by two Polish displaced persons. They were not agents or employees of the United States in either a technical or a non-technical sense. In no way can the United States be deemed responsible for their actions.
Our second inquiry pursuant to plaintiff’s theory of the case is, would plaintiff be entitled to workmen’s compensation if his injuries had been sustained under the same circumstances while he was employed in private business? Had plaintiff been injured during the course of private business employment, he would, under the usual state or federal [4] workmen’s compensation statutes, be entitled to compensation for the injuries he received. However, we have concluded that plaintiff could not have recovered under the facts of this case if he had been employed in private business because his injuries did not arise out of or in the course of Iris employment.
It is a well settled rule that injuries sustained by an employee while going to or from his place of employment are not compensable under workmen’s compensation statutes. See, generally, Cardillo v. Liberty Mutual Insurance Co., 330 U.S. 469 (1947); 99 C.J.S. Workmen?s Gompensation §232 (1958), and 58 Am. Jur. Workmens Gompensation § 217 (1948). Furthermore, the record contains no evidence that would bring this case within any recognized exception to the general rule. As we have stated, plaintiff volunteered to walk his assistant home. Even if it is assumed that she *233 was a fellow employee in the Officers’ and Enlisted Men’s Club or in the AES in the auditing endeavor, plaintiff was never instructed to escort her home. He testified that often he did not walk with her to her home and felt under no duty to do so. That evidence, standing alone, shows that plaintiff’s injuries were not sustained in the course of his employment.
Moreover, the evidence in this case establishes that plaintiff’s assistant was not a fellow servant of plaintiff. He alone was responsible for her employment and he paid her compensation. Neither the AES nor the Officers’ and Enlisted Men’s Clubs urged, encouraged, or participated in her employment.
The facts in this case in many ways resemble those in Gordon v. United States, 148 Ct. Cl. 31, 180 F. Supp. 591 (1960), a congressional reference case in which the plaintiff claimed damages for injuries received from an explosion of grenades by three members of the armed services, who were on leave at the time. The following quotation from the court’s opinion at pp. 39-40 is, we think, particularly applicable in this case:
Nor do we find that plaintiffs have any equitable claim against the United States. The plight of the plaintiffs who were seriously injured through no fault of their own, arouses the sympathy of all, but the responsibility for their injuries is upon the three individuals who perpetrated this outrage and is not the responsibility of the United States. * * * Plaintiffs’ injuries resulted solely from the deliberately wrongful and shameful act of the three drunken individuals. * * * The three servicemen were on leave, for the time being under no military control and engaged in no Government business whatever.
For the reasons stated, it is our conclusion that plaintiff has neither a legal nor an equitable claim against the United States, and that if an award is made to him, it would be a gratuity.
This opinion and the findings of fact incorporated herein will be certified by the Clerk to the House of Representatives pursuant to its resolution of reference.
*234 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs, makes findings of fact as follows:
1. On December 13, 1946, the plaintiff signed a contract with the Army Exchange Service, European Theater, a non-appropriated fund instrumentality, whereby he accepted employment as a junior auditor with the Army Exchange Service in Germany for a period of one year from the date of his departure from the United States. The contract contained, inter alia, the following pertinent provision:
14. Employee hereby waives for himself, his heirs, successors and assigns all claims against the United States, its instrumentalities, branches, officers and agents of any loss, damage or injury that may be suffered by him, to his person or property during the continued existence of this contract or any renewal thereof.
There was no language in plaintiff’s contract of employment with the Army Exchange Service which precluded plaintiff from accepting other employment in his off duty hours. The contract provided that “No overtime compensation will be paid under any consideration.”
2. Army Regulation 210-65, Army Exchanges, dated June 12,1945, the regulation in effect at all times pertinent hereto, provided in part as follows:
2. Definitions. — a. An Army exchange, as an adjunct of the Army, supplies merchandise and services to specified persons and organizations and is financed by non-appropriated funds, as defined in AR 210-50.
11. Army _ Exchange Service. — a. The Army Exchange Service has jurisdiction over and provides staff supervision of the operation of all Army exchanges, and consist of such officers, enlisted men, and civilian personnel as are necessary.
* * * * S:
35. Contracts.— * * *.
% # # # #
h. (1) Exchange contracts are solely the obligation of the exchange. They are not Government contracts and the distinction between exchange contracts and Govern *235 ment contracts will be observed and clearly indicated at all times.
3. Army Begulation 210-50, Nonappropriated Funds, December 13, 1945, in effect at all times pertinent hereto, provided in part as follows:
1. General. — Certain revenue-producing and welfare activities are necessary adjuncts to the Army and are authorized. Bevenue-producing, welfare, and sundry activities are designed to supplement activities supplied by the Government from appropriated funds and are designed to contribute to the comfort, pleasure, contentment, and mental and physical improvement of military personnel; the f mids accumulated will be dispersed solely for the benefit of military personnel. The nature of these activities imposes on the War Department the responsibility of supervising their administration and providing adequate controls.
^ $ if!
3. Definitions. — a. Nonappropriated funds. — Nonap-propriated funds consist of cash, investments, or other assets accumulated to finance the conduct of revenue-producing, welfare, and certain other activities. * * *.
4. Funds authorized. — a. The following funds of revenue-producing activities are authorized:
(1) The Army exchange fund.
% * * * *
c. The following types of sundry funds are authorized :
(1) Funds of officers’ clubs, noncommissioned officers’ clubs, aviation cadet clubs, etc.
*****
23. Councils or boards of welfare and sundry funds.— a.In addition to the council prescribed for central post funds (par. 9c (2) ), there will be a council or board for each of the following classes of funds: * * *.
*****
(3) Sundry funds.
*****
b. * * * Councils or boards for special welfare and sundry funds will consist of such membership as is prescribed by higher authority or by the constitution of the organization, but in no event will there be less than three members.
c. The duties of the council or board are to—
(1) Ascertain that the fund is being properly ad *236 ministered, that all proper revenues have been received, and that expenditures are within the purposes of the fund.
(2) Approve such proposed expenditures from the fund as may be deemed proper.
4. Upon his arrival in Germany, the plaintiff was assigned to work at Camp Grohn, near Bremen. Living quarters were assigned to him in the town of Lesum, which adjoins Camp Grohn. The plaintiff had been born in Germany in a town near Lesum. He emigrated to the United States in 1926 and became a citizen in 1933. He is a resident of Staten Island, New York.
5. Camp Grohn and the town of Lesum were in the Bremer-haven Enclave. The Army security force in the Bremer-haven Enclave consisted primarily of the First Battalion of the 18th Infantry commanded by Lieutenant Colonel Kelleher. Colonel Kelleher had no supervisory authority over the Army Exchange Service’s personnel. Scattered throughout the Enclave area, which was some 60 miles long and 12 to 14 mile wide, were 18 branch establishments which comprised the Bremerhaven Port of Embarkation Officers’ and Enlisted Men’s Clubs. Those clubs served the officers and enlisted men of the Enclave security force. Like the Army Exchange Service, those clubs were nonappropriated fund instrumentalities, but they had no connection with or relation to the Army Exchange Service.
6. The operation of the Enclave security force’s Officers’ and Enlisted Men’s Clubs was supervised by the Club Fund Council which was composed of approximately 5 to 7 officers. The Club Fund Council was responsible for maintaining the accoimting records of the two clubs. The day to day operations of the clubs were handled by the club officer who was under the supervision of the Club Fund Council, and he was custodian of the funds for both clubs. Periodically, it was necessary that the books of the two clubs be audited. Prior to the spring of 1947 these audits had been done by German bookkeepers who were paid for their services out of the club funds.
7. Sometime during the early part of 1947 the Club Fund Council decided that it was time for one of the periodic audits of the clubs’ boobs. As a result of that decision, *237 Colonel Kelleher, the commanding officer of the 1st Battalion, contacted Major Bereuter and informed him that he needed someone with experience to straighten out his officers’ and enlisted men’s clubs’ fund accounts and that if one of the Exchange Service’s auditors was willing to perform the work he would arrange to pay the man for his efforts. Major Bereuter asked the senior auditor to ascertain whether any of the auditors wished to perform the task and asked him to inform anyone who wished to do it that the work would have to be performed on off-duty time and that Colonel Kelleher had stated that the individual would, be paid for the work. A few days later the senior auditor indicated to Major Bereuter that plaintiff would do the work. Major Bereuter told plaintiff that the work was voluntary and pointed out to him that any work to be performed for the officers’ and enlisted men’s clubs was to be done in his off-duty time and that the payment for such work was strictly a matter between plaintiff and Colonel Kelleher.
8. When plaintiff went to Colonel Kelleher, he was sent to Lieutenant Todd, the club officer for the officers’ and enlisted men’s clubs’ funds. Lieutenant Todd told plaintiff that the audit could be performed either at the joint office of the officers’ and enlisted men’s clubs or at plaintiff[1]’s quarters, since the records to be audited would not be needed for the current operation of the clubs. Because of transportation problems which plaintiff would face in going from his home to the clubs’ offices, it was determined that it would be more convenient for him to take the necessary books and records and work on the audit at his quarters. Lieutenant Todd and plaintiff further agreed that his compensation for performing the audit would be determined by the parties after the plaintiff had progressed far enough to determine the extent of the work encompassed in the audit. The compensation which plaintiff was to receive for the audit was to be paid from the funds of the officers’ and enlisted men’s clubs.
9. Plaintiff worked on the audit in the evenings in his quarters. During his working hours of nine to five he utilized some of the time obtaining information from noncommis- *238 sioned officers attached to the clubs. On several evenings he secured the services of Mrs. Lottie Meyer, a 30 year old German national, to assist him in the preparation of the audit. Mrs. Meyer, the widow of a German officer, was employed by the Army Exchange Service, but the assistance which she rendered plaintiff in his performance of the audit was not connected with her Army Exchange Service employment. In that endeavor, she was working solely for plaintiff, and he compensated her with chocolates, cigarettes and drygoods material, since Americans were not allowed to give German citizens American currency.
10. On the evening of July 8, 1947, plaintiff and Mrs. Meyer were working in his quarters on the audit of the books of the officers’ and enlisted men’s clubs. They were using a typewriter borrowed from the Army Exchange. During the course of the evening they both consumed an insignificant quantity of liqueur. At approximately 11 or 11:30 p.m., when Mrs. Meyer was ready to leave, several other men who were present in the house wherein plaintiff was quartered offered to take her home but plaintiff wanted to escort her and he alone walked with her for part of the approximately two miles to her house. It was considered unsafe for unescorted women at night in that vicinity.
11. At approximately 12 midnight on July 8, 1947, while returning to his quarters after his walk with Mrs. Meyer, plaintiff was ambushed by two men who beat him about the head and inflicted severe injuries.[1] About 2% hours later, plaintiff was discovered lying unconscious near the road, bleeding profusely from open wounds on his head and face and from his ears. After receiving first aid he was removed to the 319th Station Hospital in Bremenhaven. A report of investigation made by the Army, dated November 17,1947, made the finding that the plaintiff’s injury was “In line of duty”.
12. For about 10 days the plaintiff remained in a coma. He survived and was returned to the United States aboard a hospital ship in August 1947.
13. The plaintiff lost certain personal property which he had on his person at the time he was assaulted. After the *239 attack upon him all of Ms personal effects were taken into custody by the local office of tbe Criminal Investigation Division, United States Army. Said effects included clothing, a traveling bag, certain Danish and Norwegian securities, and the records of the officers’ and enlisted men’s clubs which he had been auditing just prior to the assault upon him. Shortly after these items were taken into custody, the office of the Criminal Investigation Division, to which they had been taken for safekeeping, was burglarized and the items in question removed by persons unknown. None of said items of personal property has ever been recovered.
14. Prior to plaintiff’s return to the United States, Lieutenant Todd visited him in the hospital in an attempt to ascertain the whereabouts of the books and records of the officers’ and enlisted men’s clubs. Lieutenant Todd was accompanied by a Mr. Ewald Wulf, a fellow employee of plaintiff’s at the Army Exchange Service, who took some personal belongings to plaintiff. On August 13, 1947, subsequent to that visit, Lieutenant Todd, believing that Mr. Wulf was in contact with plaintiff, gave him $150 from the funds of the officers’ and enlisted men’s clubs to take to plaintiff in the hospital in payment for the work which he had rendered on the audit. Since the books and records of the officers’ and enlisted men’s clubs had been stolen, Lieutenant Todd did not know whether plaintiff had completed the audit prior to his assault. Mr. Wulf signed a receipt which evidenced the fact that he had “received one hundred and fifty ($150. — ) from Lieutenant Todd for Mr. Elmers”. When he gave Mr. Wulf the money Lieutenant Todd also gave him the standard club forms which plaintiff was to complete as evidence of the fact that he had received the money. Mr. Wulf apparently returned these forms to Lieutenant Todd purportedly signed by plaintiff, but Lieutenant Todd was not familiar with plaintiff’s signature and did not know whether the completed receipt forms were in fact signed by plaintiff. Plaintiff denies receiving any payment for performing the audit of the books of the officers’ and enlisted men’s clubs and asserts that he does not know Mr. Wulf.
15. The physicians who attended the plaintiff at the hos *240 pital in Germany, Captain Walter Elder and Captain William Howard, testified at the trial as to the extent of his injuries. They found several extremely dangerous skull fractures with injuries to the brain at the site of the fractures, also a severance of the seventh cranial nerve which would, in their opinion, result in permanent paralysis and disfigurement of one side of the plaintiff’s face. They testified that in their opinion the brain injuries would permanently disable the plaintiff from working again as an accountant and probably from pursuing any gainful occupation. After first admitting that they could not predict the exact medical complications which might occur as a result of plaintiff’s assault, they enumerated the following possibilities: convulsions, generalized dementia, loss of mental capacity, further paralysis of other cranial nerves, hemorrhages with cerebral vascular action, loss or partial loss of hearing due to the perforation of both eardrums, and some loss of vision. They also testified that the injuries to the brain were severe enough to kill the plaintiff instantly and that he may yet die as a result of said injuries. They further testified that serious damage had been caused to plaintiff’s kidneys by the severe blows inflicted upon him by his assailants.
16. The plaintiff filed with the Department of the Army a certificate, dated September 9, 1952, from his private physician, Dr. George L. Trefousse, 241 Central Park West, New York, N.Y., the text of which reads as follows:
This is to certify that I have been treating Mr. Bern-hard Elmers, of 200 Pleasant Plains Avenue, Staten Island, N.Y., since September 16,1947. Pie was treated on account of a post-concussion syndrome with focal signs following an accident on July 9, 1947, while he was connected with the Un ited States Army.
Mr. Elmers has recovered from the aftereffect of this accident and has been able to return to work from 1948 on.
Dr. Trefousse has continued to treat the plaintiff and, on July 24, 1963, issued a certificate, the text of which reads as follows:
This is to certify that I have been treating Mr. Bernard [sic] Elmer [sic] of 200 Pleasant Plain [sic] *241 Avenue, S.I. since September 16, 1947. He has been suffering from the sequelae of a fracture of the brain, he has been subject to grand and petit mal attacks, which occur about three to four times a year. On September 22,1962 he was subject of a severe grand mal attack and had to be admitted at the Eichmond Memorial Hosp on Staten Island. The last seizure was recorded on January 17,1963.
17. Since the plaintiff returned to the United States in August 1947, he has received private medical treatment on account of his injuries, but neither the Department of the Army nor the court is advised as to the amount of the expenses incurred by him for such treatment. The medical treatment and hospitalization of the plaintiff in Army hospitals were furnished without cost to him except for a small charge for subsistence.
18. There was in effect at the time of plaintiff’s employment with the Army Exchange Service an insurance policy which the Army Exchange Service had voluntarily entered into with a private insurance company, the Indemnity Insurance Company of North America, pursuant to Public Law No. 208 of the 77th Congress, 55 Stat. 622, which entitled an employee of the Exchange injured in the course of his employment to be paid the amount which he would have received had he been covered by the Longshoremen’s and Harbor Worker’s Compensation Act.
19. On October 18, 1947, after his return to the United States, plaintiff gave an unsworn statement concerning the July 8th assault to a representative of the Indemnity Insurance Company of North America and that company relied upon the statement in determining their liability under the aforementioned policy. At the time he gave the statement to the insurance company’s representative, plaintiff was aware that this statement was to be utilized by the insurance company in determining whether he had been injured in the course of his employment with the Army Exchange Service. In that statement he falsely stated that he was working alone in Ms quarters on the night of July 8, 1947, and that after finishing his work on the audit of the officers’ and enlisted men’s clubs’ books he had decided to relax before going to bed by walking by himself along the Lesum Eiver, and that *242 while walking he was assaulted. Plaintiff’s false statement that he was working alone and had gone walking along the river alone when in fact Mrs. Meyer had been working with him in his quarters and he was walking her home prior to being assaulted, was made, according to his testimony at the trial of this case, to avoid trouble with his wife, whom he believed overheard the statement he gave to the insurance company’s representative.
20. Subsequent to obtaining the statement from plaintiff, the Indemnity Insurance Company of North America advised the New York office of the Army Exchange Service as follows:
Please be advised that we have obtained a signed statement from Mr. Elmers wherein he states that shortly after midnight on July 9th he left his home Billet to take a walk through the village of Lesum and that he was walking along the bank of the Lesum River in a woody section when he was assaulted and sustained his injuries. In view of the foregoing, the injuries that he sustained did not arise out of and during the course of his employment and we are declining liability.
21. A bill, H.B. 4803, was introduced in the 81st Congress, which provided for the payment to the plaintiff of the sum of $12,500 for the damages sustained by him as the result of the incident which occurred on the night of July 8, 1947 ($10,000 for personal injuries; and $2,500 for the loss of securities and other items of personal property). The Chairman of the Committee on the Judiciary, House of Representatives, requested the Department of the Army to submit a report on said bill. On February 2,1950, the Department of the Army, with the approval of the Bureau of the Budget, transmitted a favorable report on the bill to the Chairman of the House Committee on the Judiciary in which it stated, in part, as follows:
Inasmuch as the evidence in this case shows that Mr. Elmers was assaulted while returning to his quarters late at night after having worked on an audit of the accounts of the officers’ mess and the enlisted men’s club at the direction of his commanding officer, and as there is no method by which he may be compensated for the damages sustained by him except through the enactment of special legislation by the Congress, such as that pro *243 posed in H.R. 4803, the Department of the Army would have no objection to the favorable consideration of this bill by the Congress. Considering the nature and extent of the injuries sustained by Mr. Elmers, which have resulted in a large degree of permanent disability, the earnings lost by him on account of his injury, and the value of the personal property lost, the proposed award of $12,500 provided in H.R. 4803 appears to be fair and reasonable.
This claimant has no remedy under the Federal Tort Claims Act (60 Stat. 843 ; 28 IT.S.C. 931), as revised and codified by the act of June 25, 1948 (62 Stat. 933; 28 U.S.C. 1346(b)), and as amended by Public Law 55, 81st Congress, approved April 25, 1949, for the reasons (1) that the incident o-ut of which his claim arose occurred in a foreign country, and (2) that Mr. Elmers’ injuries were not caused by the negligent or wrongful act or omission of any employee of the Government.
22. H.R. 4803, 81st Congress, was amended by the Congress so as to provide that the award of $12,500 contained therein be paid to the plaintiff “out of the funds appropriated for the International Refugee Organization”. By a memorandum of disapproval, dated January 6, 1951, the President of the United States withheld his approval from said bill (96th Cong. Rec. 17139 (1951)). That memorandum stated in pertinent part as follows:
Mr. Elmers is precluded from recovering by any means other than this special relief legislation any compensation for his personal injuries out of Federally appropriated funds. He is not entitled to the benefits of the Federal Employees Compensation Act since he was an employee of the Army Exchange Service and paid from nonappropriated funds. He is without remedy under the Federal Tort Claims Act. Nor is he apparently entitled to the benefits of the employee's compensation program, provided from primate sources, for the protection of Army Exchange employees. The lack of any other right of recourse, and the severity and incapacitating nature of the injuries inflicted upon him led the Congress in the end, to feel that restitution to this claimant from some federal funds source was justified, even though purely gratuitous.
While this case presents a stirring appeal and the plight of the claimant the deepest sympathy, I cannot find any basis to support the view that the United States *244 should recompense the claimant for the tortious and criminal acts committed upon him. It is true that the assailants previously had been employed as civilian guards at an American Quartermaster depot but they had been discharged some time prior to the night of the assault. The fact of former employment by the United States obviously does not give rise to a proper fastening of responsibility upon the Federal Government for their action. Neither can the fact that they were displaced persons give support to any such attachment. They were not in any way under the supervision or control of Federal officials. That the extra work Mr. Elmers was engaged in on this particular night was being performed at the suggestion or request of an Army officer, likewise, affords no promise for Federal responsibility. The arrangement was entirely one between the officer and the claimant, and related to work even more remote from federal employment than his regular employment with the Army Exchange Service.
Upon a record thus bare of any participation by the Federal Government, functionally or by acts of its officers and employees, in the unprovoked assault upon the claimant, I find myself readily and completely in agreement with the position of the Senate Committee on the Judiciary that there is no conceivable liability on the part of the Government for the injuries received by Mr. Elmers. In the absence thereof, the enactment of this bill would indeed, open the door to a wide and unchartered field of Federal liability and insurmountable fiscal effects.
23. Thereafter, on March 7,1951, another bill, ILK. 2304, 82d Congress, for the relief of the plaintiff was introduced in the Congress. That bill provided for a payment to plaintiff of $2,500 “in full satisfaction of his claim against the United States for securities and property lost while in possession of military authorities on July 8, 1947, when he was assaulted and robbed while employed as a civilian employee of the Army Exchange Service, to wit, a junior auditor, serving with the Army in Germany”. H.K. 2304, 82d Congress, was enacted by the Congress, and it was approved by President Truman on May 11, 1951, becoming Private Law 25, 82d Congress.
24. Subsequent to the 82d Congress, bills providing relief for plaintiff were introduced in the 83rd, 84th and 85th *245 Congresses, viz: H.R. 8970, 83rd Congress; H.R. 1404, 84th Congress, and H.R. 1673, 85th Congress. Each of those bills died in the Senate Judiciary Committee after passing the House. (See the History of Bills and Resolutions for the 83rd Cong. 2d Sess.; 84th Cong. 1st Sess.; and 85th Cong. 1st Sess.)
25. The present claim is before the Court of Claims pursuant to House Resolution 112, 87th Congress, 1st Session, which reads as follows:
Resolved, That the bill (H.R. 2676) entitled “A bill for the relief of Bernhard F. Elmers,” together with all accompanying papers, is hereby referred to the Court of Claims pursuant to section 1492 and 2509 of title 28, United States Code; and the court shall proceed expeditiously with the same and report to the House, at the earliest practicable date, such findings of fact, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy, and conclusions based on such facts as shall be sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.
26. The bill (H.R. 2676) referred to the Court of Claims by House Resolution 112 provided in part as follows:
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary ox the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Bernhard’F. Elmers, of Staten Island, New York, the sum of $10,000, in full satisfaction of all claims of the said Bernhard F. Elmers, against the United States arising out of personal injury on July 8,1947, when he was assaulted and robbed by two men while he was employed as a civilian employee of the Army Exchange Service, to wit, a junior auditor, serving with the United States Army in Germany: * * *.

 Since tie petition in this case was filed prior to the decision of the Supreme Court in Glidden Co. v. Zdanok, 370 U.S. 530 (1962), we think it proper to file this report without reference to the Supreme Court’s opinions in that case. Consequently, defendant’s suggestion of lack of jurisdiction to entertain congressional references is rejected.

 In 1947 Germany was under Allied military occupation. Bremen was an enclave under united States control in the British Zone.

 The Officers’ and Enlisted Men’s Clubs were supervised by the Club Fund Council and had no connection with the Army Exchange Services. Both operations were financed from funds they themselves generated. However, for many purposes, non-appropriated fund activities are deemed to he instru-mentalities of the United States, see generally, Brummitt v. United States, 165 Ct. Cl. 78, 329 F. 2d 966 (1964).

 Employees of private (non-governmental) employers in the District of Columbia are covered by workmen’s compensation coverage by virtue of D.C. Code §36-501(1961), 45 Stat. 600 (1928), which specifically applies the provisions of the Longshoremen’s and Harbor Workers’ Compensation Act, 33 U.S.C. §§ 901-950, 44 Stat. 1424 (1927). The insurance policy carried by the Army Exchange Service, and applicable to plaintiff, generally gears its coverage to this latter Act.

 The assailants, two Poles, were apprehended, tried, and sentenced to 30 years imprisonment.