Valerie Loucrecia BRELAND, By and Through Beverly B. BRELAND, Guardian and Next Friend, Plaintiff,

v.

UNITED STATES of America, Defendant.

Beverly B. BRELAND, Individually and as Administratrix of the Estate of Charles Adam Breland, Plaintiff,

v.

UNITED STATES of America, Defendant.

Linda K. HENDERSON, Individually and as Administratrix of the Estate of Charles Nicholas Henderson, Plaintiff,

v.

UNITED STATES of America, Defendant.

Addie PARKER, Representative of the Statutory Beneficiaries of Jesse P. Parker, III, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ.A. Nos. H85–0320(G), H86–0039(G), H86–0056(G) and H86–0167(G).

United States District Court, S.D. Mississippi, Hattiesburg Division.

Oct. 15, 1990.

Ben F. Galloway, Albert Necaise, Gulf-port, Miss., Bryan, Nelson, Randolph, Land and Weathers, Jon Mark Weathers, Paul R. Lambert, John W. Lee, Hattiesburg, Miss., Eddy Parson, Wiggins, Miss., for plaintiffs.

Stephen R. Graben, Asst. U.S. Atty., Biloxi, Miss., for defendant.

## BENCH OPINION

GEX, District Judge.

This cause came on for trial before the Court without a jury on June 18, 1990. The Court, having fully considered the testimonial and documentary evidence presented by both parties at trial, the arguments of counsel, and the applicable law, and being otherwise fully advised in the premises, makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure:

### Findings of Fact

Beverly B. Breland is the mother and natural Guardian of Valerie Loucrecia Breland, a minor. Beverly B. Breland is the duly appointed Administratrix of the Estate of Charles Adam Breland and is the only authorized representative of the wrongful death beneficiaries of Charles Adam Breland, deceased. Linda Kay Henderson is the Administratrix of the Estate of Charles Nicholas Henderson, deceased, and is the authorized representative of the wrongful death beneficiaries of Charles Nicholas Henderson, deceased. Addie Parker is the representative of the statutory death beneficiaries of Jesse P. Parker, III, deceased. The plaintiffs bring this action against the United States under the provisions of the Federal Tort Claims Act [FTCA], 28 U.S.C. §§ 1346(b), 2671–80.

On or about October 23, 1985, a Complaint was filed on behalf of Valerie Loucrecia Breland against the United States of America seeking monetary damages for personal injuries sustained by the minor on March 22, 1984. Separate Complaints were subsequently filed by the wrongful death beneficiaries of Charles Adam Breland (deceased), Charles Nicholas Henderson (deceased), and Jesse P. Parker, III (deceased), seeking all damages allowable under the wrongful death statute of the State of Mississippi which resulted from the deaths of the three minors on March 22, 1984. The four separate actions were consolidated for discovery and trial purposes by the Court's Order dated August 28, 1986.

This litigation concerns the explosion which occurred on March 22, 1984, at the home of Robert and Beverly Breland. On that day, Charles Adam Breland, age 7, Charles Nicholas Henderson, age 4, and Jesse P. Parker, III, age 9, were killed and Valerie Breland, age 10, was injured when a 66 mm LAW Rocket or a portion thereof exploded at the residence of Robert and Beverly Breland. The explosion occurred at approximately 4:45 p.m. while one or more of the minor children were playing with the rocket or a portion of the rocket in the area of the carport of the Breland residence.

An unfired LAW rocket consists of a fiberglass launch tube, rocket motor, and warhead. The LAW rocket is manufactured exclusively for the military and is issued to soldiers in an assembled tube.

Once fired, the launch tube is returned while the rocket motor propels the warhead down-range where the warhead is supposed to explode on impact. Occasionally, the warhead does not explode and remains alive (unexploded) where it has landed. An unexploded warhead which has already been fired is known as a "dud." Even where the warhead explodes, the rocket motor remains partially intact. This rocket motor is located inside a brass tube and is not capable of exploding.

On the day of the explosion, Beverly Breland traveled to school to pick up her children, Valerie and Adam, and her sister's child, Jesse Parker, III. On the way home, they stopped at the Parker's house in McHenry which is located adjacent to Parker's Scrapyard. Beverly and Valerie entered the house for twenty to thirty minutes while Jesse and Adam remained outside. Then, Beverly, Valerie, Adam and Jesse entered the Breland automobile and traveled the estimated four miles to the Breland home. At approximately 4:20 P.M., Robert Breland, father of Valerie and Adam Breland and husband of Beverly Breland arrived from work. A few minutes later Linda Henderson, sister of Beverly Breland, and Nicholas Henderson, her son, arrived at the Breland residence. All the children came inside for a little while and then went back outside to the carport to play. At approximately 4:45, the explosion occurred. All of the adults ran outside where they first saw Valerie Breland underneath a sheet of plywood and sitting on a go-cart. They immediately removed her to the lawn because the go-cart and carport were on fire. They discovered Adam and Jesse Parker, III, lying motionless on the ground. After ascertaining that these two were dead, Robert Breland picked up Nicholas Henderson and handed him to Linda. Linda tried to comfort Nicholas and Valerie. Various neighbors began to arrive and one of them drove Valerie and Nicholas to the Stone County Hospital. Nicholas and Valerie were later transferred to Forrest General Hospital in Hattiesburg where Nicholas died. Valerie suffered shrapnel wounds all over her body, the loss

of a small portion of her foot, and loss of the lens on one of her eyes.

Since the Breland residence is in Stone County, Mississippi, the Stone County Sheriff's Department was informed of the explosion. Sheriff Eldon Ladner travelled to the Breland residence where he and his deputies conducted an extensive investigation. By the time he had arrived, photographs had been made of the entire scene. His investigation recovered two LAW rocket motors and numerous fragments of metal. He found one of the rocket motors (Exh. P–29) a few feet from the carport and the other one a few feet farther away. Sheriff Ladner did not know if either of the rocket motors were involved in the explosion.

Colonel Lee Russell, Director of State Personnel for the Mississippi Military Department, was requested to conduct an investigation for the Army's civilian claims facility. While conducting his investigation, Colonel Russell examined the two LAW rocket motors that were recovered from the Breland residence. He found a "nose cone" among the items recovered from the Breland residence but was not sure what weapon it was from. Russell also examined a two-inch threaded piece of metal that was given to him by Robert Breland. Russell did not ascertain exactly what exploded. He also could not determine if either LAW rocket motor was attached to the explosive. He thought that there must have been a third law rocket piece which exploded. Russell was informed by the Explosive Ordnance Detachment (EOD) at Camp Shelby that it had recovered three more LAW rocket motors at the Parkers' Scrapyard.

Robert Breland revealed that on the Saturday preceding the explosion, Adam had found two brass tubes with fins (which he identified as resembling the two LAW rocket motors recovered from the Breland residence) at the Parker Scrapyard. Robert Breland said that he asked Jesse Parker, Jr., if Adam could have the items and he said that he could. Jesse Parker, Jr., denies this. Robert thought the items were safe because they were hollow. The Bre-

lands took the items to their residence and Adam kept them on the carport where he played with them. Robert denies that these two items had a "warhead" attached to them.

One of the rocket motors recovered from the Breland residence had an identifiable lot number. Russell discovered that LAW rocket motors with this lot number were assembled into LAW rockets which were shipped to military bases all around the country, including Camp Shelby. Although he testified that it was possible and 60% probable that it came from Camp Shelby, Russell could not trace this LAW rocket motor to Camp Shelby. He also did not find out when the rocket was taken from Camp Shelby (if it was taken from Camp Shelby). Russell did not find how the explosive got to the Breland residence. Further, all of the plaintiffs denied any first-hand knowledge of how the children came to be in possession of the rocket, who brought the rocket to that location, when it was brought there and from where it came. Although Robert and Beverly Breland surmise that one of the children picked up the rocket at the Parker Scrapyard in McHenry, Mississippi earlier that day and brought it to the Breland residence, neither of them are personally aware of the circumstances by which the rocket arrived at their home. Jesse Parker, Jr., and Addie Parker, owners of Parker Scrapyard, denied any knowledge of how the rocket came into the possession of the minor children on the occasion of the explosion. Similarly, Linda Henderson denied any knowledge of the circumstances by which the rocket came into the possession of the minor children at the Breland residence on March 22, 1984. All plaintiffs contend however that the rocket which exploded on March 22, 1984, came from Camp Shelby, Mississippi, a National Guard training site located approximately thirty (30) miles from the Breland residence. The plaintiffs deny any knowledge of the circumstances which led to the rocket being removed from Camp Shelby, how the rocket was removed, who removed it, when it was removed, from where it was removed, why it was removed and to where it was taken.

The plaintiffs assert that the defendant was negligent in the operation of its training facility at Camp Shelby and that such negligence caused the deaths and injuries of the plaintiffs. The plaintiffs assert that because Camp Shelby was only an estimated thirty (30) miles from the Breland residence, the LAW rocket must have been removed from Camp Shelby. However, Sergeant Major Willie Lebon, a specialist in Explosive Ordnances, testified that the military has used LAW rockets all over the world since he entered in the military in 1967. Lebon further testified that LAW rockets are fired at various military bases in the southeast including: Fort Polk, La.; Fort Rucker, Ala.; Fort McLelland, Ala.; Fort Benning, Ga.; Fort Stewart, Ga.; and Eglin Air Force Base, Fla. Also, there was conflicting testimony by various military personnel on whether or not LAW rockets were ever fired at other military bases in Mississippi. Thus, it is only a possibility that the explosive device in question came from Camp Shelby. The Court finds that the evidence is insufficient to establish that the rocket, which exploded at the Breland residence, originated at Camp Shelby.

Assuming the LAW rocket did come from Camp Shelby, the operations of the Camp Shelby Training Site must be considered. Prior to March 22, 1984, the defendant, the United States of America, operated an ammunition supply point and firing ranges at Camp Shelby, Mississippi. The majority of Camp Shelby, located near Hattiesburg in Forrest County, Mississippi, is situated on United States Forest Service land. The Mississippi National Guard uses the land pursuant to a special use permit and Memorandum of Understanding with the United States Forest Service. The camp is used to train members of numerous National Guard units and all branches of the United States Armed Forces.

Camp Shelby has a total acreage of 136,-000 acres, of which 4,600 acres are devoted to impact areas. The training of troops for combat makes it necessary that they be allowed to fire and train with live weapons. Gum Range North is a range designated for use to train soldiers to fire Light Anti-

Tank Weapons (LAW) and 40 mm rifle grenades. LAW are also identified as 66 mm LAW M72. Both weapons produce duds (i.e., unexploded ordinance). Also, both weapons are relatively short range weapons (the LAW has a range of 300 meters) and the range on which they are found is considered a small to medium size range.

The military establishes permanently contaminated ranges for the training of the personnel. Army Regulation (AR) 385–63 regulated Procedures for Firing Ammunition for Training, Target Practice and Combat. This Regulation establishes certain procedures for firing range safety. AR–385–63 has been changed and amended on numerous occasions. AR–385–63 was amended effective November 15, 1983 so as to require the fencing and posting of dedicated impact areas wherein 40 mm grenades were fired. However, Camp Shelby had already fenced its 40 mm grenade ranges in 1978. No Army regulation requires the fencing or posting of warning signs on military ranges where LAW rockets are fired. Camp Shelby's LAW rocket range was fenced and had warning signs since it was also a 40 mm range. The fencing consisted of four strands of barbed wire which was on three sides of Gum Range North. The north side of the Gum Range, where the range was bordered by a creek, was not fenced since it was part of the dedicated impact area. The two gates on the Gum Range were originally only a couple of strands of barbed wire tied across the openings. Gates with locks were added in the early 1980's. Warning signs are placed a couple hundred feet apart and are highly visible according to the Camp Shelby personnel. The warning signs are 16″ × 12″ across and bordered with red paint. They contain the following warning: "DANGER—MILITARY FIRING RANGE, UNEXPLODED SHELLS DO NOT ENTER." This area of Camp Shelby is not patrolled by security although Camp Shelby Range personnel are in those areas throughout the year and throughout working days.

Camp Shelby Regulations Annex E, among other things, required that a plan be formulated and implemented to clear all firing ranges, including Gum Range North, of all unexploded ordinance or duds. It was the responsibility of the Explosive Ordinance Detachment Unit at Camp Shelby to clear or decontaminate the Gum Range of all unexploded shells. Sergeant Lebon worked in this unit (and was in charge for part of his term) from 1973 to 1980. He testified that his unit would clear Gum Range North when instructed to by the Camp Shelby Range Control. He testified that they would clear the Gum Range two to four times a year. The clearing of the range involved EOD workers making overlapping sweeps on foot across the ranges. They would mark the range as they proceeded to insure that no areas were missed. They also swept the areas outside but adjacent to the fences. Lebon testified that although he could not have guaranteed that a range was completely clear after they swept it, it was very unlikely that a particular dud would remain on the range for longer than a year. Lebon did not know why the number of clearing operations would have changed after he left in 1980. After reviewing the EOD journals from February 1982 until March 1984, it was Lebon's opinion that the range was only cleared once during that span, on March 21, 1983.

Gum Range North is in an isolated area but is accessible by civilians as a result of its proximity to gravel roads which interconnect and join paved roads. The forest service lands nearby are also used for hunting and contain a lake which is used by the public. The plaintiffs assert that Camp Shelby officials knew, or should have known, that the range has been frequented for many years by individuals for the purpose of sightseeing, exploring, hunting, or removing various Government property, including scrap metal, from the range, and the government' failure to take adequate precautions to prevent such people from removing military items permitted the removal of the object which exploded at the Breland residence. The plaintiffs contend that Camp Shelby officials became aware of numerous incidents where military hard-

ware had been removed. Various Camp Shelby officials testified that they had heard that:

(1) In September of 1977 someone had removed two (2) MI-14 Personnel Carriers from a firing range of Camp Shelby and that said property had been "cut-up" and sold to J.P. Parker, a scrap dealer, in McHenry, Mississippi; scrap was recovered and returned to Camp Shelby;

(2) In 1978 a minor from Louisiana removed a 40 mm grenade from Gum Range North and returned to Louisiana where the device exploded;

(3) In July of 1980, two (2) minors removed a 40 mm grenade from the Gum Range which exploded and killed one of the children; and

(4) In January of 1981 a child was killed while on the Gum Range by an exploding 40 mm grenade.

Also, Camp Shelby employees testified that they had heard of other employees being caught on the ranges. Not one of the trespassers was charged or prosecuted at the instance and request of the defendant. Furthermore, the EOD Journal reflects that military ordnance and parts thereof were recovered throughout Mississippi including over twenty LAW rocket motors near Wiggins. Mr. Shaw and Sheriff Ladner testified that they had seen military hardware outside of the impact areas. The EOD also recovered three LAW rocket motors from the Parker Scrapyard. However, these instances of trespassing and removal of unexploded shells could not have provided the defendant with notice if the LAW rocket, which exploded at the Breland residence, was removed prior to these occurrences. Since there was insufficient proof to show the date that this LAW rocket was removed from the Gum Range at Camp Shelby (if at all), then the above mentioned instances of trespassing do not make the removal of the explosive in this case foreseeable (especially since the record is barren of proof of the circumstances surrounding the object's removal).

In his attempt to ascertain the origin of the object which exploded at the Breland residence, Col. Russell discovered that one of the LAW rocket motors contained lot number NOR-2-3 (Exhibit P-29). This lot number was on rocket motors which became part of whole LAW rockets bearing LS-220-105RW lot numbers. Some of these assembled LAW rockets with these lot numbers were delivered to Camp Shelby in 1977 and 1978. Larry Hall, supervisor of Camp Shelby's Ammunition Supply Point (ASP), testified that LAW rockets remained at Camp Shelby for only a year before they were fired or returned. Thus, a LAW rocket arriving in 1977 or 1978 would have been most likely fired prior to October 1979. As noted earlier by Sergeant Lebon, an exploded LAW rocket could have laid on the range for only a year before it would have been removed. Thus, a LAW rocket fired (but unexploded) as late as October 1979 was probably removed by October 1980 and Camp Shelby Official's knowledge of trespassing after 1980 and their action or inaction after 1980 would not be the cause of the plaintiff's injuries. Furthermore, the Court cannot reasonably conclude that the LAW with the identified lot numbers was the one that exploded at the Breland's residence because there was insufficient proof that either of the two rocket motors found at the scene were connected to the rocket which exploded.

### Conclusions of Law

In actions brought against the United States under the Federal Tort Claims Act [FTCA], 28 U.S.C. §§ 1346(b), 2671-2680, the law to be applied by the Court is the law of the place where the alleged negligence occurred. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Assuming that the rocket which exploded at the Breland residence on March 22, 1984, was located at Camp Shelby at the time of its "removal," Mississippi substantive law applies to the extent there has been a waiver of sovereign immunity under the facts of this case. The plaintiff principally relies on a negligence theory to recover. It is axiomatic then that in order to recover the plaintiff must prove by a preponderance of evidence that (1) the de-

**1134**

fendant owed a duty; (2) the duty was breached; (3) the breach caused the injury; and (4) the plaintiff suffered damages.

■ Under Mississippi law, the standard of care applicable in cases of alleged negligent conduct is whether or not the party charged with negligence acted as a reasonable and prudent person would have under similar circumstances. *Knapp v. Stanford,* 392 So.2d 196 (Miss.1980); *Danner v. Mid–State Paving Co.,* 173 So.2d 608 (Miss. 1965). If a defendant's conduct is reasonable in light of the "foreseeable risks," there is no negligence and no liability. *Reaves v. Wiggs,* 192 So.2d 401 (Miss.1966). In addition, a defendant must only take reasonable measures to remove or protect against "foreseeable hazards" that he knows about or should know about in the exercise of due care. *Millers of Jackson, Inc. v. Newell,* 341 So.2d 101 (Miss.1976). A defendant is obligated solely to safeguard against reasonable probabilities and is not charged with foreseeing all occurrences, even though such occurrences are within the range of possibility. *See Pargas of Taylorsville, Inc. v. Craft,* 249 So.2d 403 (Miss.1971); *Saucier v. Walker,* 203 So.2d 299 (Miss.1967). In the context of the present litigation, liability on the part of the United States depends upon whether the events which led to the explosion at the Breland residence on March 22, 1984, were foreseeable so that the United States was required to alter its performance or conduct. Based upon the foregoing, the Court concludes that the explosion was not foreseeable. Similarly, the circumstances which lead to the presence of the rocket at the Breland home were obviously not foreseeable. Such conclusions are required because there is absolutely no evidence as to how the rocket came to be located at the Breland's residence in March of 1984. The Court can only speculate as to the sequence of events which lead to the rocket coming into the possession of the children. Second, there is a lack of sufficient evidence to conclude that the rocket in question came from Camp Shelby. The plaintiffs seek to impose liability upon the United States in this case simply because there is a possibility that the rocket was removed from a

firing range at Camp Shelby by some unknown person, at an unknown time, and under unknown circumstances. The Court cannot engage in such speculation and conjecture. In other words, the few facts which are known about the circumstances by which the rocket in question may have come to be located at the Breland home do not support the plaintiffs' claims that the explosion of March 22, 1984, was a foreseeable consequence of the United States' conduct in operating and maintaining the Gum Range North at Camp Shelby, Mississippi.

■ The plaintiffs' proof in this case is also insufficient in that it fails to demonstrate that an employee of the United States acted negligently under Mississippi substantive law and that such negligence was the proximate cause of the explosion. The FTCA, 28 U.S.C. § 1346(b), requires the plaintiffs to prove that the injuries and damages sued upon were "caused by the negligent or wrongful act or omission of [an] employee of the Government while acting within the scope of his office or employment." *See Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); *Simpson v. United States,* 454 F.2d 691 (6th Cir.1972). The evidence does not establish who, by his act or omission, placed, or caused to be placed, the LAW rocket in question at the Breland residence; or when it was placed there; or that the person so placing it, or causing it to be placed, was an employee in any capacity of the United States; or, if he was an employee of the United States that he was acting within the scope of his employment; or that in such action or omission he was negligent in any respect or particular.

In a very similar situation, the court in *Ferrer v. United States,* 163 F.Supp. 769 (D.P.R.1958), commented as follows:

In short, there is a complete failure of evidence imposing on the defendant any responsibility for the presence of the instrument in the spot where the youth found it. At least, the court could reach a conclusion favorable to plaintiff only by a guess, and by an uninformed and factually unsupported guess, at that. It

will not thus pervert its fact finding function.

*See also, Simpson v. United States,* 454 F.2d 691 (6th Cir.1972) (dismissal of complaint because record lacked any evidence of the circumstances under which teenager obtained a grenade); *Voytas v. United States,* 256 F.2d 786 (7th Cir.1958) (ownership of explosives is not sufficient to make the United States liable under the FTCA because there must be proof of negligent conduct by a government employee while acting within the scope of his employment); *United States v. Coffey,* 233 F.2d 41 (9th Cir.1956) (presence of aerial practice bomb on private property not shown to be due to the negligence of any officer, agent, or employee of the United States and to reach such a conclusion required "Unadulterated speculation" and "untrammeled imagination"); *Porter v. United States,* 228 F.2d 389 (4th Cir.1955) (plaintiff failed to meet burden of proof in showing that detonator had been deposited on a roadside dumpt as result of wrongful act or omission of Army personnel or anyone acting with its authority); *United States v. Inmon,* 205 F.2d 681 (5th Cir.1953) (no liability under FTCA without proof of specific act or omission on the part of an employee of the United States).

Furthermore, the United States, in its operation of Gum Range North, complied with AR 385–63. The plaintiffs have failed to demonstrate to this Court how additional security measures or more frequent range clearance operations would have resulted in the avoidance of the incident of March 22, 1984. Notwithstanding, the FTCA does not require the United States to comply with its regulations. *See Tindall v. United States,* 901 F.2d 53, 56 n. 8 (5th Cir. 1990). Thus, the United States could not be liable even if the Army breached one of its own regulations.

■ The plaintiffs also argue for the imposition of liability under the attractive nuisance doctrine, which requires the exercising of reasonable or ordinary care towards a trespassing child unless the child comprehends the danger. *Coleman v. Associated Pipeline Contractors, Inc.,* 444 F.2d 737 (5th Cir.1971). However, that doctrine does not apply to this case because, in *Lucas v. Hammond,* 116 So. 536, 539 (Miss.1928), the Mississippi Supreme Court stated the doctrine as follows:

"One who maintains dangerous instrumentalities or appliances on his premises easily accessible to children and of a character likely to attract them in play, or permits dangerous conditions to remain thereon with the knowledge that children are in the habit of resorting thereto for amusement"—and who fails to exercise ordinary care to prevent children from playing therewith or resorting thereto, is liable to a child *non sui juris* who is injured thereby, and who did not know and instrumentality or in the vicinity of the dangerous condition, or was too young to be charged with such knowledge.

Accordingly, the attractive nuisance doctrine applies only where children actually trespass upon the property of another. *Harkins v. City of Carthage,* 284 So.2d 530, 531 (Miss.1973). The evidence does not indicate that any of the children trespassed upon the firing ranges at Camp Shelby,[1] and, consequently, the doctrine has no applicability in this case.

■ Since, if the rocket came from Camp Shelby, its removal was unlawful and accomplished by an unknown third-party by unknown means, the Court must consider the proximate cause of the injuries being claimed in this action. *Saucier v. Walker,* 203 So.2d 299 (Miss.1967): *Peel v. Gulf Transport Co.,* 174 So.2d 377 (Miss.1965). Under Mississippi law, although one actor may be guilty of negligence, he is relieved of liability if another, acting independently and voluntarily, puts into motion another and intervening cause which efficiently leads in unbroken sequence to the injury. *Mississippi City Lines, Inc. v. Bullock,* 13 So.2d 34 (Miss.1943). The Mississippi Su-

---

**1.** All of the parents denied ever taking their children to a military installation and denied that anyone else had taken them to one.

preme Court has defined intervening negligence in *Hoke v. W.L. Holcomb & Associates, Inc.*, 186 So.2d 474 (Miss.1966) as follows:

> Although one may be negligent, yet if another, acting independently and voluntarily, puts in motion another and intervening cause which efficiently thence leads in unbroken sequence to the injury, the latter is the proximate cause and the original negligence is relegated to the position of a remote and, therefore, nonactionable cause. Negligence merely furnishes the condition or occasion upon which injuries are received, but does not put into motion the agency by or through which the injuries are inflicted, is not the proximate cause thereof. The question is, did the facts constitute a succession of events so linked together as to make a natural whole, or was there some new and independent cause intervening between the alleged wrong and the injury? 38 Am.Jr., p. 702; *Thompson v. Mississippi Cent. R. Co.*, [175 Miss. 547] 166 So. 353 (1936); *Bufkin v. Louisville & N.R. Co.*, [161 Miss. 594] 137 So. 517 (1931).

Further, an intervening cause is not reasonably anticipated if it is a remote possibility, such as a criminal act. *See Touche Ross & Co. v. Commercial Union Ins. Co.*, 514 So.2d 315 (Miss.1987). Therefore, the Court concludes that the removal of the rocket from Camp Shelby (if it occurred) was an unforeseeable intervening cause, sufficient to eliminate the alleged negligent conduct of the United States in its operation and maintenance of the firing ranges at Camp Shelby.

The Fifth Circuit reached a similar conclusion in *Garza v. United States*, 809 F.2d 1170 (5th Cir.1987). In *Garza*, a child was injured by an explosive device which had been stolen from a military base. After first determining that the United States was negligent for failing to maintain adequate control over the explosive device, the Fifth Circuit concluded that the injury was not foreseeable. *Id.* at 1175. The Court found that the negligence of the Government agents in their handling of the explosive device was so far removed from the

injury sued upon that there were independent and intervening causes which rendered the injury unforeseeable. *Id. See Voytas v. United States*, 256 F.2d 786 (7th Cir.1953) (soldier stole explosives which later injured others); *United States v. Inmon*, 205 F.2d 681 (5th Cir.1953) (government had fenced and put up warnings where child was injured); *Schmidt v. United States*, 179 F.2d 724 (10th Cir.1950) (plaintiffs injured by bazooka shell taken from military base without permission); *Gordon v. United States*, 180 F.Supp. 591, 148 Ct.Cl. 31 (1960) (soldier stole grenades and blew up bar).

■ The plaintiffs claim that the United States violated Miss.Code Ann. § 45–13–107 (1972). This statute requires a person engaged in the business of using explosives to keep such items under his control and secure from theft or pilferage. However, the occurrence of a theft does not necessarily establish that there has been a violation of this section. The evidence in this case fails to present sufficient facts for this Court to make a reasoned evaluation and, determination of the circumstances and events surrounding the removal of the rocket from Camp Shelby or some other military installation. The mere fact that the rocket appeared at the Brelands' residence on March 22, 1984, does not necessarily imply that this statute was violated at some point in time prior thereto. The absence of proof as to the date of the removal of the rocket prevents the Court from determining if the removal occurred prior to the effective date of this statute. Hence, this statute does not provide a basis for imposition of liability on the defendant.

■ The plaintiffs are also precluded from obtaining an imposition of liability on a theory of strict liability. The FTCA does not authorize suit against the United States for claims based upon strict or absolute liability. *Laird v. Nelms*, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972); *Tindall*, 901 F.2d at 55 n. 3. A claim for relief against the United States cannot be predicated upon a theory of strict liability or the fact that the United States engages in

ultrahazardous activities such as the use of explosives. *See Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1951); *Wright v. United States,* 404 F.2d 244 (7th Cir.1968).

■ Finally, the Court determines that in establishing requirements for the operation of its firing ranges, the Army has committed to the discretion of its officers in charge (including the range safety officers) the selection of the procedures by which the Army firing ranges would be operated and maintained (including safety). Also, the measures taken in implementing the firing range program were left to the discretion of the officer in charge and any challenge to the adequacy or sufficiency of those measures, so long as they meet the general guidelines set out in AR 385–63, must fail under the discretionary function exception found in Subsection (a) of 28 U.S.C. § 2680. *See Miller v. United States,* No. C85–415T (W.D.Wash.1986).

The discretionary function exception applies when an agency makes a decision grounded in social, economic, and political policy. *Begay v. United States,* 768 F.2d 1059 (9th Cir.1985). All of the commanders for Camp Shelby testified that their decision not to use patrols and only use formstrand barbed wire fences with warning signs was based on the regulations and the economics. Hence, the plaintiffs' claims are barred by the discretionary function exception.

#### Conclusion

The plaintiffs have failed to meet their burden of proof in attempting to establish a case of negligence against the United States. Therefore, the complaints of the plaintiffs should be dismissed with prejudice and judgment entered in favor of the United States in each of the consolidated civil actions.

Counsel for the defendant shall submit an Order in conformity with the foregoing Bench Opinion within ten (10) days of the date of entry hereof.