Denise CONLON, administrator ad prose-
quendum of the estate of James Conlon,
and Denise Conlon, individually, Plain-
tiff,

v.

UNITED STATES of America, Defendant.

Dimitrios ZAZARAS, Plaintiff,

v.

UNITED STATES of America and
Beacon Scrap Iron and Metal
Co., Defendants.

Civil Action Nos. 94–3140
MLP, 95–1564 SMO.

United States District Court,
D. New Jersey.

March 26, 1997.

Irene Dowdy, Assistant United States Attorney Faith S. Hochberg, United States Attorney, Trenton, NJ, for United States.

Todd B. Eder, Garruto & Cantor, P.C., East Brunswick, NJ, for Plaintiff Dimitrios Zazaras.

J. Stewart Husid, Pamela J. Collins Longhi, Levinson, Axelrod, Wheaton, Grayzel, Caulfield, Marcolus & Dunn, Edison, NJ, for Plaintiff Denise Conlon.

## OPINION

PARELL, District Judge.

These matters are before the Court on the United States' motion for summary judgment and, alternatively, to dismiss plaintiffs' complaints for lack of subject matter jurisdiction. Also before the Court is Beacon Scrap Iron and Metal Company's ("Beacon") motion for summary judgment in case number 95–1564. The cases were ordered consolidated by Magistrate Judge Hughes only for the purpose of deciding the dispositive motions. For the reasons stated, the United States' motion for summary judgment is granted and Zazaras' claim is dismissed pursuant to 28 U.S.C. § 1367(c)(3).

### INTRODUCTION

The issue presented is whether the United States can be held liable for damages from what appears to be an explosion of military ordnance. The Court holds that because plaintiffs have failed to provide any evidence that the explosive device came from any federal military installation, the United States is entitled to summary judgment. The Court also finds that plaintiffs' claims are barred under the Discretionary Function Exception, 28 U.S.C. § 2680(a).

### BACKGROUND

At approximately 1:15 P.M. on November 8, 1992, there was an explosion on the premises of Beacon, a privately owned scrap metal business located at 215 Throckmorton Street, Freehold, New Jersey. James Conlon, an employee of Beacon, was operating a crane in Beacon's yard at the time and was killed by the blast. Denise Conlon, administrator ad prosequendum of James Conlon's estate, brought a wrongful death action against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq. ("FTCA"). Her Complaint alleges that

> employees of the Department of the Navy, the Department of the Army or the Department of the Air Force, agencies of the United States of America, acting within the scope of their office or employment, failed to properly safeguard, maintain, supervise or control hazardous military munitions.

(Conlon Compl. ¶ 5.)

Dimitrios Zazaras lived in Beacon's neighborhood at the time of the explosion and alleges that he has sustained a hearing loss and other injuries as a result. Zazaras has brought an action against the United States under the FTCA, and has also named Beacon as a defendant. Zazaras alleges that: (1) Beacon negligently purchased and/or received explosives from the United States; and (2) the United States "negligently sold to, transferred to, delivered to and/or disposed of explosives, and/or failed to inspect materials" allegedly delivered to Beacon, and/or failed to warn or provide proper instructions to Beacon's employees. (Zazaras Compl. ¶¶ 2, 3.)

Beacon is in the business of buying scrap metal from trash haulers and others, and its scrap yard is open to the public. (Decl. of Irene Dowdy, Exs. US–1 at 2, Zazaras 1 at 14.) The explosion of November 12, 1992 was investigated by the Borough of Freehold Police Department and the Monmouth County Prosecutor's office, with the assistance of the New Jersey State Police Bomb Squad (the "Bomb Squad"). The Bomb Squad collected debris from the site, and forwarded it to the FBI Laboratory (located in Washington, D.C.) for analysis. (Id., Exs. US–2, US–3 at 7–19.)

The blast debris were examined by FBI Supervisory Special Agent Heckman, who was asked to determine whether the explo-

sion could have been caused by a piece of military ordnance. (*Id.*, Exs. US–2, US–4, US–5 at 25.) In his written report to the Local law enforcement authorities, Heckman stated that "the explosion was caused by a very brisant[1] high explosive consistent with those used by the military." (*Id.*, Ex. US–4 at 3.) At deposition, Heckman explained that because of the physical appearance of the debris (fragments displaying thinned, sharp edges indicating rapid stretching of the metal), he concluded that this had been a rapid chemical explosion, indicative of high explosive. (*Id.*, Ex. US–5 at 36–37.) When questioned about his use of the phrase "consistent with those used by the military" in his written report, Heckman testified that he used that phrase because it answered the specific question he was asked to resolve, *i.e.*, could this explosion have been caused by military ordnance. (*Id.*, Ex. US–5 at 43–44.) He further testified that highly brisant explosives, however, are not exclusively military in origin; in fact, the same physical effects are produced by a number of commercial or industrial highly brisant explosives. (*Id.* at 44.) Heckman concluded that, based on the evidence presented for analysis, it was impossible to determine with scientific certainty whether the explosion at Beacon was either military or commercial in origin. (*Id.* at 37–38, 43–45.)

Plaintiff's expert, William J. Cruice of Hazards Research Corporation, disagrees with this conclusion. After reviewing photographs of the site and the debris, Cruice states that "the only probable causative agent for the incident in question is a military warhead or similar military device." (*Id.*, Conlon 1 at 5.) This conclusion is dictated, Cruice opines, because the "use of the indicated high explosives ... outside military applications is practically non-existent." (*Id.*) Cruice also asserts that identification of the device as a military item is further indicated because "TNT [trinitrotoluene] is not extensively used and is essentially unavailable in the non-military market" and trace tetryl residues were tentatively detected at the blast site. (*Id.* at 3.)

In response to Cruice's opinion, Heckman points out that: (1) no metal has been identified which originally encased the explosive material, thus "there is no forensic evidence whatsoever to indicate that a steel encased explosive device was responsible"; (2) while it is true that tetryl has not been used commercially in the United States for a number a years, TNT is used commercially in a variety of products produced by, *inter alia*, Austin Powder Company, Trojan Corporation and Sierra Chemical Company; and (3) other companies, such as Beta Chemicals, offer bulk high explosives commercially, including Comp A–5, Comp C–4, HMX, Octol and TNT, all of which are normally considered military explosives. (., Ex. US–6 at 3–4.) In addition, Heckman notes that the instrument that tentatively detected tetryl residues at the blast site (a Barringer ion mobility spectrometer) has proven to be unreliable. Moreover, Heckman asserts, even if the ion mobility spectrometer correctly characterized the blast residues, because no control swabs from the hands of the evidence collection personnel were submitted, a determination as to the source of the tetryl residues cannot be made. (*Id.* at 2.) Heckman concludes that

the FBI Laboratory is not stating or implying in any way that a commercial explosive was responsible for the explosion. In actuality, there is no forensic evidence upon which an opinion could be based, with any scientific certainty, as to whether a military or commercial explosive was responsible for the explosion in this matter.

(*Id.* at 4. )

In the general vicinity of Beacon, the United States Navy operates Naval Weapons Station Earle ("NWS Earle"). NWS Earle supplies the fleet of the United States Navy with material, including ammunition. A number of Navy personnel are stationed at NWS Earle, however, many of the station's operations are carried out by civilian employees of the Department of Defense. NWS Earle includes ordnance storage facilities, office

---

1. "Brisance" refers to the shattering or crushing effect of an explosive. Webster's Third New International Dictionary 279 (1986). The more powerful the explosive material, the more "brisant" it is.

buildings, factories and restaurants. (*Id.*, Ex. US–8.)

In 1992, NWS Earle began a recycling program to deal with its glass, paper, newspaper and scrap metal. Scrap was collected throughout the station and then sold to outside bidders. (*Id.*, Ex. US–10 at 11.) During 1991 and 1992, civilian employees from NWS Earle transported scrap to Beacon for recycling. (*Id.*, at 11–14.) Patrick Briers was a civilian employee at NWS Earle, and was one of the individuals that transported scrap from NWS Earle to Beacon in 1992. An employee of Beacon, Thomas Schuster, asked Briers on one of his visits whether he could obtain for him "a practice or dud rocket missile or anything like that." (*Id.* Ex. US–11 at 2.) Briers brought Schuster what he believed to be a dummy "three-inch anti-aircraft" round a short time after this request. (*Id.*, Ex. US–12 at 18.) Schuster showed the round to his cousin, Scott Firestone, who became concerned that it might be live after all, and subsequently took it to the Manalapan Police Department on or around August 4, 1992. The Manalapan Police then contacted the Explosive Ordnance Disposal ("EOD") units at Fort Monmouth and NWS Earle. (*Id.*, Ex. US–3 at 19.) The EOD physically cut into the round at Fort Monmouth and determined that it was totally inert, *i.e.*, it contained no explosive material. (*Id.* at 28.) It was subsequently determined that the round Briers had taken to Schuster was a practice loading round for an experimental gun system that was never produced and that the round itself was filled with navy/lima beans and Epsom salts. (*Id.*, Ex. US–14 at 1–2.) During this investigation it was also determined that Briers had stolen a quantity of scrap iron from NWS Earle and sold it to Beacon at the same time he gave Schuster the dummy round. (*Id.*, Exs. US–12 at 8–12, 22–23, 27–28; US–13.) The law enforcement authorities eventually closed their investigations without having determined the cause of the explosion. (*Id.*, Exs. US–3 at 31–32; US–7 at 52–53.)

### DISCUSSION

Federal Rule of Civil Procedure 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Once the moving party has net its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial. *Id.* at 324, 106 S.Ct. at 2553. "By its very terms, the standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Material facts are only those facts that might affect the outcome of the action under governing law. *Id.* at 248, 106 S.Ct. at 2510; *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir.1991).

Moreover, the role of the judge at the summary judgment stage is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Id. at 249–50, 106 S.Ct. at 2511 (citation omitted).

### I. Plaintiffs' Claims Against The United States

The FTCA provides a waiver of the federal government's sovereign immunity in certain circumstances. The Act permits suit against the United States

for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the

scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b). An employee of the government includes officers or employees of any federal agency; members of the military and naval forces; and persons acting on behalf of a federal agency in an official capacity. 28 U.S.C. § 2671. It has been generally recognized that, under this statutory language, Congress intended the FTCA to impose liability on the federal government for the negligent wrongs of its employees under the common law principle of *respondeat superior. See. e.g., Laird v. Nelms,* 406 U.S. 797, 801, 92 S.Ct. 1899, 1901–02, 32 L.Ed.2d 499 (1972); *United States v. Becker,* 378 F.2d 319, 321 (9th Cir.1967).

■ Importantly, the language of the Act makes it clear that as a predicate to liability, the proof must show the injury to have been caused by a negligent or wrongful act or omission of a government employee. *Dalehite v. United States,* 346 U.S. 15, 44–45, 73 S.Ct. 956, 972–73, 97 L.Ed. 1427 (1953). Moreover, in *Dalehite,* the Supreme Court made it clear that the statute would not permit imposition of liability against the United States under a common law theory of absolute liability for ownership of a "dangerous commodity" or for engaging in an "extra-hazardous" activity. *Id.; see also Voytas v. United States,* 256 F.2d 786, 790 (7th Cir. 1958).

The case at hand is by no means the first attempt to hold the United States liable under the FTCA following explosions of military ordnance. In *Simpson v. United States,* 454 F.2d 691 (6th Cir.1972), a Navy chaplain's son ("Carpenter") had hidden an army rifle grenade in a wooded area adjacent to a military training area. Carpenter gave the grenade to his friend Simpson. Simpson subsequently dropped the grenade and it exploded. At trial, Simpson introduced no evidence as to how, when or where Carpenter had originally found the grenade. The district court dismissed the action at the close of plaintiff's case on the ground that there had been *no proof of the government's negli-*

gence. *Id.* at 692. citing *Dalehite,* the Sixth Circuit affirmed, stating:

> In the present case, the record is barren of any evidence of the circumstances under which Carpenter obtained the grenade. There is nothing in the record to establish or to indicate that he did so by reason of the negligence of any employee of the United States.

*Id.* at 692–93.

A similar result obtained in *Porter v. United States,* 228 F.2d 389 (4th Cir.1955). In that case, a twelve-year-old boy found a hand grenade of army origin at a dump and took it home, whereupon it exploded in his hand. The area including the dump previously had been part of a military reservation, but was at the time of the incident privately owned. There was, however, an Army fort nearby. In addition, there was no public system of garbage disposal, and area residents, as well as the military, dumped garbage and household trash in the open country. There was no evidence that the military dumped ordnance material of any kind, but the evidence also showed

> that certain persons living in the vicinity of the Fort ... made a practice of going on the range within the Fort in order to pick up exploded or live ammunition and other ordnance materials which they would burn in order to pick out the brass and other metals and sell them to junk dealers. . . . The Army made efforts to prevent brass-spicking and some of the offenders were imprisoned.

*Id.* at 390. The district court determined that the plaintiffs had failed to show that the grenade which caused the injury had been deposited on the roadside dump as the result of the wrongful act or omission of Army personnel. On appeal, the Fourth Circuit affirmed for the same reasons. *Id.*

More recently, in *Breland v. United States,* three small children were killed and another injured while they were playing with a rocket in the carport of a private residence. 791 F.Supp. 1128, 1129 (S.D.Miss.1990). An investigation of the explosion indicated that the device was a 66 mm LAW rocket used by the Army. *Id.* Camp Shelby, a National Guard training site, was located about 30

miles away; LAW rockets were used at Camp Shelby and other military bases around the country. *Id.* at 1131. It was never determined precisely how the rocket got to the Breland residence. In fact,

> all of the plaintiffs denied any first-hand knowledge of how the children came to be in possession of the rocket, who brought the rocket to that location, when it was brought there and from where it came.... All plaintiffs contend, however, that the rocket ... care from Camp Shelby ... The plaintiffs deny any knowledge of the circumstances which led to the rocket being removed from Camp Shelby, how the rocket was removed, who removed it, when it was removed, from where it was removed, why it was removed and to where it was taken.

*Id.* The court found that the plaintiffs had failed to establish negligence against the United States under the FTCA. Relying on *Dalehite*, the court noted that

> [t]he evidence does not establish who, by his act or omission, placed, or caused to be placed, the LAW rocket in question at the Breland residence; or when it was placed there; or that the person so placing it, or causing it to be placed, was an employee in any capacity of the United States; or, if he was an employee of the United States that he was acting within the scope of his employment; or that in such action or omission he was negligent in any respect or particular.

*Id.* at 1134.

▋ In the case at hand, the Court will assume, without deciding, that the explosion was caused by military ordnance. Even with this assumption, however, plaintiffs' claims against the United States must fail. Despite extensive discovery, plaintiffs have been unable to provide any evidence that the explosive device came from NWS Earle or any other federal military installation. Nor have plaintiffs provided any evidence as to how the explosive device itself came to be at Beacon's yard. Instead, plaintiffs rely on the inference that because a NWS Earle civilian employee was able to remove a dummy shell and give it to a Beacon employee, and the explosion was apparently caused by military ordnance, the United States must have been negligent as to its security measures surrounding live ordnance. Faced with a similar lack of proof after the explosion of what appeared to be military ordnance, the court stated in *United States v. Coffey:*

> There was no evidence of negligence by any officer, agent or employee of the government. There is no direct evidence that the bomb was ever in the possession of the government. While the circumstantial evidence might well establish this point, there was no evidence of any kind from which inferences could be logically drawn as to other essentials of proof. It is pure guess work to say whether the bomb was previously in the hands of the Army, the Navy or some government contractor. It is unadulterated speculation to conclude that it was dropped on this privately owned land by either service from an airplane. Someone else might have carried the bomb from the depot or the bombing field before or after it had been dropped. It further requires the use of an untrammeled imagination to find that the "dropping" occurred while said personnel were acting within the scope of their authority and in the line of active duty, upon which point there is not even a scintilla of evidence.

233 F.2d 41, 43–44 (9th Cir.1956). Here, plaintiffs' claims fail because, as in *Coffey*, it would be pure "guess work" to say whether the bomb was previously in the hands of NWS Earle or any other federal military installation.[2]

▋ Moreover, plaintiffs cannot rely on the doctrine of *res ipsa loquitur.* The prop-

---

2. Plaintiffs' claims are also barred under the Discretionary Function Exception ("DFE"). 28 U.S.C. § 2680(a). The DFE "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988).

A two-part test is used to determine whether the DFE applies in a given case; the DFE bars a claim against the United States where: (1) the challenged governmental conduct involves an element of judgment or choice; and (2) the challenged governmental activity is grounded in social, economic or political policy considerations. *United States v. Gaubert,* 499 U.S. 315, 323, 111 S.Ct. 1267, 1273–74, 113 L.Ed.2d 335 (1991).

er application or *res ipsa* requires, *inter alia*, that the instrumentality of the injury be shown to be within the defendant's exclusive control. *See, e.g., Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 74 (3d Cir. 1996); *Coffey*, 233 F.2d at 44; *Simpson*, 454 F.2d at 693. Because large numbers of a wide variety of military ordnance have been found in possession of civilians, particularly in the New Jersey shore area,[3] plaintiffs cannot establish defendant's exclusive control. Accordingly, defendant's motion for summary judgment must be granted.

## II. Zazaras' Claim Against Beacon

■ Zazaras' claim against Beacon is based on supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). (Zazaras Compl. ¶ 9.) The district courts, however, may decline to exercise supplemental jurisdiction over a claim under § 1367(a) when the court has, as here, dismissed all claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c)(3). "The idea here is that once the crutch is removed—the claim that supports the supplemental jurisdiction of the other claim or claims—the other should not remain for adjudication." 28 U.S.C. § 1367, Practice Commentary, Discretionary Rejection of Supplemental Jurisdiction. Accordingly, Zazaras' claim against Beacon shall be dismissed.[4]

Courts have consistently recognized that federal military authorities have policy based discretion to make decisions as to the safe management of munitions and other military equipment. *See, e.g., Boyle v. United Technologies Corp.*, 487 U.S. 500, 511, 108 S.Ct. 2510, 2518, 101 L.Ed.2d 442 (1988) (selection of design of military equipment is a discretionary function involving trade-offs between greater safety and greater combat effectiveness); *Kirchmann v. United States*, 8 F.3d 1273, 1277 (8th Cir.1993) (decisions of Air Force as to degree of supervision over missile facility contractor protected by DFE); *Creek Nation Indian Hous. Auth. v. United States*, 905 F.2d 312, 313–14 (10th Cir.1990) (government's design of bombs and its spot inspection of truck transporting same are protected by DFE). Thus, the DFE precludes claims against the United States of general negligence in safeguarding ordnance. Furthermore, plaintiffs have not alleged any breach of a mandatory, specific directive linked to the explosion at Beacon. Accordingly, plaintiffs' claims must be dismissed.

3. During World War II, a ship carrying military ordnance exploded near South Amboy, New Jersey. (Decl. of Scott R. Shire ¶ G.) This explosion distributed ordnance over a large area in and around South Amboy. (*Id.*) Over the last three years, approximately 250 landmines have been recovered from these civilian areas. (*Id.*) Requests for EOD assistance from the local communities typically increase during the late spring and summer months due to increased activity from beachcombers, construction workers, fishermen and dredgers who locate ordnance in the course of their activities; EOD has been called upon to pick up ordnance from the Sandy Hook, New Jersey area between 4–10 times per year during the late spring and summer months, and between 3–5 times per year throughout the rest of the year. (*Id.* ¶¶ B, C.)

4. It should be noted that 28 U.S.C. § 1367(d) provides that the period of limitations for any claim asserted under § 1367(a) shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless state law provides for a longer tolling period.

## ORDER

For the reasons stated in the accompanying Opinion,

**IT IS THEREFORE** on this 26th day of March, 1997, **ORDERED** that the United States' motion for summary judgment be and hereby is **GRANTED** in case numbers 94–3140 and 95–1564; and

**IT IS FURTHER ORDERED** that plaintiff Zazaras' claim against Beacon in case number 95–1564 be and hereby is **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c)(3).